# THE CAMDEN AND ATLANTIC RAILROAD COMPANY v. THE MAY'S LANDING AND EGG HARBOR CITY RAILROAD COMPANY.

1. When a transaction is complete and the party seeking relief has performed on his part, the plea of *ultra vires* by the corporation which has acquiesced in it is inadmissible in an action brought against it for not performing its side of the contract in all those instances where the party who has performed cannot, upon rescission, be restored to his former *status*.

2. The state may interpose its authority at any time and compel an abandonment of the act in excess of power, and if need be revoke the charter of the company for its usurpation.

3. When the state challenges the legality of the transaction, the paramount and only question is whether it has bestowed upon the company the requisite authority to engage in it. When the question arises between the company and the other party to the contract, other legal principles apply in determining whether the contract shall be observed.

4. The liability of the company does not rest upon the doctrine of ratification, which, in ordinary legal acceptation, applies to such contracts as a party has authority to make, but upon acquiescence, on which the other party has acted, so that he cannot be restored to his former *status*, and thereby the company is precluded from interposing its own infirmity as a defence.

5. Under the circumstances presented by this case, the agreement must be dealt with as a contract executed substantially on both sides.

On error to Supreme Court.

For the plaintiff in error, *Peter L. Voorhees.*

This was an action of debt brought to recover rent alleged to be due from the plaintiff in error to the defendant in error, from December 1st, 1881, to June 1st, 1882.

The declaration counted upon a pretended lease made by the defendant in error to the plaintiff in error, dated June 26th, 1873, leasing the railroad, &c., for the term of nine hundred and ninety-nine years, for the annual rent of $5000, payable half-yearly, a copy of which lease was annexed to the declaration as part thereof, and averred that six months' rent became

·due June 1st, 1882, and was unpaid, whereby an action had accrued to the plaintiff; and also counted in *indebitatis* for use and occupation, and common counts and *in quantum meruit* for use and occupation. To the declaration there was annexed a copy of the lease and a statement of the amount for which judgment would be demanded, as follows : " Judgment will be demanded in the above cause for the rent of said railroad from December 1st, 1881, to June 1st, 1882, $2500. Interest thereon from June 1st, 1882." The pleas were *non est factum, nil debit*, &c.

: The case was tried at the Camden Circuit, in the January Term, for the year 1885. A verdict was rendered, under the direction of the judge, for the defendant in error, for $2906.67, and judgment was entered on the verdict February 17th, 1885, with $243.87 costs.

At the trial of the cause certain exceptions were taken to the rulings of the judge upon the exclusion and admission of evidence, and to the judge's charge and refusal to charge the jury, which were sealed and are brought up with the record in this case. It appeared at the trial that the plaintiff below claimed six months' rent for the railroad on a pretended lease of the railroad of the plaintiff below, to the defendant below, dated June 26th, 1873, for the term of nine hundred and ninety-nine years, at a yearly rent of $5000, payable in equal half-yearly payments, on the 1st days of June and December in each year; that under the pretended lease the defendant below had operated the said railroad for a number of years up to February 1st, 1882, when it ceased operating the railroad, after having given notice to the president of the plaintiff below, in January, 1882, of its intention so to do. It further appeared that after the cause was at issue, and on the 22d day of May, 1884, the defendant below, by permission of the court, paid to the clerk of the court $1083.61, being $833.33 for said rent from December 1st, 1881, to February 1st, 1882, $100.28 for interest thereon, and $150 out of which the taxed costs were to be paid ; and the pleadings were thereby ordered to be amended, and the claim for said amount stricken out of

said declaration, and that the plaintiff should not be permitted to give evidence of said sums. So that at the time of the trial all the rent had been paid up to the 1st day of February, 1882, for the whole time the defendant below had been possessed of or operated said railroad.

It further appeared that the Camden and Atlantic Railroad Company was incorporated by an act of the legislature of this state, approved March 19th, 1852. *Pamph. L., p.* 263. In and by said act, after providing for the organization of said company and election of directors, it was enacted by the fifth section that five directors should be competent to transact all business of the corporation, to call in the capital stock by instalments, and to make such by-laws, rules and regulations as to them should appear needful and proper touching the management and regulation of the stock, property, estate and effects of the said corporation.

By section 6 it was enacted that the president and directors be authorized to lay out and construct a railroad from the city of Camden, in the county of Camden, through the counties of Camden and Atlantic, to the sea-shore, at or near Absecon inlet, in the county of Atlantic, with power to construct certain branches in said act named.

By the seventh and eighth sections provisions for the purchase and condemnation of lands for the use of said railroad.

It further appeared that the Mays Landing and Egg Harbor City Railroad Company was incorporated by an act of the legislature of this state, approved March 25th, 1871. *Pamph. L., p.* 671. In and by said act, after providing for the organization of the corporation and the election of directors, it was, by section 5, enacted that five directors should be a quorum to transact the business of the company; that the directors should have power to call in the capital stock, to make and prescribe such by-laws as to them should seem proper touching the management and regulation of the stock, property, estate and effects of the corporation.

Section 6 enacted that the president and directors be autho-

rized to construct a railroad from Egg Harbor City to Mays Landing, in the county of Atlantic.

Section 17 enacted that the said railroad company is hereby authorized to lease its railroads to or consolidate with any other railroad company, which is hereby authorized to take such lease and operate the same for such time or times and on such terms as the said parties may agree upon.

Section 18 enacted that any railroad company is hereby authorized to endorse or guarantee the bonds of the said Mays Landing and Egg Harbor City Railroad, and in any other way which the parties may agree upon to aid the said company in the construction of its said railroad.

The errors assigned are: 1. That the *narr.* is not sufficient in law. 2. That the judge at the trial admitted illegal evidence. 3. That the judge at the trial refused to admit legal evidence. 4. That the judge at the trial refused to nonsuit the plaintiff. 5. That the judge at the trial charged that the jury should find a verdict for the plaintiff. 6. That the judge at the trial refused to charge that the defendants below had never leased and had no power to lease the railroad of the plaintiffs below, and that the defendants below had never executed any lease of said railroad by authority of said company, and had no power so to do. 7. That the judgment was given for the plaintiff below, when, by the law of the land, it should have been given for the defendant below.

To the second error assigned, that the judge admitted illegal evidence. The suit, after the amendment ordered by the court above shown, was to recover four months' rent from February 1st, 1882, to June 1st, 1882. The plaintiff below, to maintain his cause, had to prove that the defendant had made a lease and had occupied the demised premises; the defence was that the lease was not properly executed. At the time of the exceptions, the plaintiff below, on cross-examination, proposed to show the number of shares of stock held by the members of the board of directors at the time of the lease, and that at the time of the lease the stock of the road was held by the members of the board of directors, and fur-

ther, to show that when one of the directors had but five shares and was a member of a copartnership, the number of shares held by said copartnership.

I submit that this testimony was not under any circumstance admissible. The number of shares of the capital stock at the time was twenty-two thousand six hundred and fourteen. If it had been shown that the directors held the whole of the stock, or a majority of it, (when in fact they owned but about four thousand seven hundred and fourteen shares,) it could not have validated the lease, so long as they acted only as directors. To validate the lease by the stockholders' action, it would have been necessary that their action should have been taken at a meeting of the stockholders. 1 *Rorer on Railroads, p.* 22 ; *Green's Brice's Ultra Vires* (2d ed.) *p.* 98.

I submit this evidence was inadmissible, and the ruling of the judge was erroneous.

Under the second error assigned, I call attention to the bill of exceptions. The plaintiff below offered in evidence a certified copy of the lease, dated June 26th, 1873, between the parties. It was objected to on the ground that the defendant below had no power to execute the lease; that the lease was never made by the defendant below, and had never been confirmed or ratified by the stockholders of the defendant below. I submit that it was error to receive the same in evidence at the time and in the manner it was offered by the plaintiff below.

Under the fifth and sixth errors assigned, I call the attention of the court to the exceptions to the charge and refusals to charge of the judge at this trial. This case, as above shown, after the payment of the money into court, and the amendment ordered by the court, was to recover four months' rent upon the covenants of the pretended lease for property of which the defendant below had not had any possession, use or benefit. It was to enforce a mere covenant from which the defendant below had not received any benefit whatever. We submit that the judge erred both in his charge and his refusal to charge.

As above shown, the Camden and Atlantic Railroad Com-

pany was incorporated for the construction of a railroad from Camden to the sea, at or near Absecon inlet, with power to construct certain branches. This company has such powers and none others than those that are expressly given by the charter and by the first section of the general act of the legislature concerning corporations, and such as may be necessary to exercise the powers as given.

That such are the powers of corporations in this state seems to be fixed by the third section of the act concerning corporations, which enacts " that in addition to the powers enumerated in the first section of this act, and to those expressly given in its charter, or in the act or certificate under which it is or shall be incorporated, no corporation shall possess or exercise any corporate powers except such as shall be necessary to the exercise of the powers so enumerated and given." *Rev., p.* 177, § 3; *Green's Brice's Ultra Vires* (2d ed.) 739; *Taylor on Corp.,* § 295; *Leggett* v. *N. J. Manufacturing and Banking Co., Saxt.* 541; *Mutual Insurance Co.* v. *McKelway,* 1 *Beas.* 133, 135; *Morris and Essex R. R. Co.* v. *Sussex R. R. Co.,* 5 *C. E. Green* 542, 562; *Wheeler* v. *Essex Road Board,* 10 *Vroom* 291.

It will be seen that there is no power given in the charter of the Camden and Atlantic Railroad Company to accept a lease from any other railroad company, or to enter into any covenant to pay the moneys of said Camden and Atlantic Railroad Company to any other company for the use of a railroad, or to become the lessee of any other railroad company and its franchises.

By the charter, the company has conferred upon it all the rights and powers necessary and expedient to survey, lay out and construct a railroad, and operate the same, and fix the rates of travel within prescribed limits. By section 5, a limited quorum of the directors are authorized to transact business, and the directors are authorized to make and prescribe such by-laws, rules and regulations as to them shall appear needful and proper touching the management and regulation of the stock, property and effects of the corporation.

I submit that this power to the directors is simply to pass by-laws, &c., for the control of the internal business of the company, and to instruct and direct its officers and agents in the management of its affairs.    *Green's Brice's Ultra Vires* (2d ed.) 509 ; *Seneca Co. Bank* v. *Lamb*, 26 *Barb.* 595; *Mechanics' and Farmers' Bank* v. *Smith*, 19 *Johns.* 115.

There being no power given in this charter to accept a lease of another railroad, and the power of the directors given by the charter being only to regulate the internal business of the railroad, I submit that neither the company nor the board of directors had any power to execute or accept the lease, or execute the covenants therein on which this action is brought.

A railroad corporation cannot, without legislative authority, transfer, by deed, mortgage, lease or other agreement, its railroad and franchises, or assume the ownership and management of some other like enterprise. Such transfer may have the effect to substitute a scheme differing from that for which authority was obtained. Such agreements are generally held void as against public policy, and will not be enforced by the courts.    *Green's Brice's Ultra Vires* 77–85 ; *Pierce on Railroads* 515 ; 1 *Redf. on Railroads* 587, 588, 619 ; 1 *Wood's Railroad Laws* 486, 488 ; 3 *Id.* 1687 ; *Thomas* v. *West Jersey R. R. Co.*, 101 *U. S.* 71 ; *Davies* v. *Old Colony R. R. Co.*, 131 *Mass.* 258 ; *Kean* v. *Johnson*, 1 *Stockt.* 407 ; *Zabriskie* v. *Hackensack, &c., R. R. Co.*, 3 *C. E. Green* 183 ; *Black* v. *Delaware and Raritan Canal Co.*, 9 *C. E. Green* 463, 464 ; *Colman* v. *Eastern Counties R. R. Co.*, 10 *Beav.* 1; *East Anglian R. R. Co.* v. *Eastern Counties R. R. Co.*, 11 *C. B.* 775 ; *Gage* v. *Newmarket R. R. Co.*, 18 *Q. B.* 457 ; *Macgregor* v. *Dover and Deal R. R. Co.*, 18 *Q. B.* 618 ; *Asbury R. R., &c., Co.* v. *Riche, L. R.*, 7 *H. of L.* 653.

This is especially the rule in New Jersey, where, as above shown, our statute, (*Rev., p.* 177, § 3,) enacts that in addition to powers in said act and given by the charter, no corporation shall possess or exercise any corporate power except such as shall be necessary to the exercise of the powers enumerated

and granted, which has been declared by this court to be an imperative rule of construction concerning corporate powers. *Morris and Essex R. R. Co.* v. *Sussex R. R. Co.*, 5 *C. E. Green* 542, 562. That this pretended lease is void and of no binding effect will appear further from the manner of its execution. It was made, entered into and executed without any act of the corporation or its stockholders, as is shown by the testimony in the case and by the minute books of the corporation, and when it was brought to the notice of the corporation and its stockholders, as shown by the minutes, it was repudiated by them. The leasing of a railroad requires the action and consent of the stockholders formally expressed at a stockholders' meeting. 1 *Rorer on Railroads* 603 ; *Stevens* v. *Davison*, 18 *Gratt.* 819.

The stockholders own the railroad and its capital in common, to be employed for specific uses provided for in the charter. The directors are the trustees of the stockholders to employ the joint capital, for the management of the road and the road only, to the end that from the investment the stockholders have chosen they may reap contemplated profit. Stockholders each contract with the other that their money shall be so employed as provided for in the charter. What the majority determines, within the scope of this contract, each are bound to abide by, but there their mutual contract ends. No majority has the right to divert any part of the joint capital to any purpose not consistent with the originally formed intentions when they became stockholders, as provided in the charter. *Kean* v. *Johnson*, 1 *Stockt.* 407 ; *Zabriskie* v. *Hackensack, &c., R. R. Co.*, 3 *C. E. Green* 183 ; *Black* v. *Delaware and Raritan Canal Co.*, 9 *C. E. Green* 463.

The corporation, by its stockholders, having never acted on the execution of said pretended lease, except to repudiate it as above shown, and having never authorized the directors, their trustees, to execute said lease, I submit the lease is void and of none effect. *Field on Corp.*, § 257, (1*st ed.*, § 229) ; 3 *Wood's Railroad Laws* 1687.

The directors by whom, it appears by the testimony, this

538    COURT OF ERRORS AND APPEALS.

Camden and Atlantic R. R. Co. v. Mays Landing, &c., R. R. Co.

pretended lease was executed, had no power thereby to bind the corporation. The directors of a railroad company are the agents or trustees of the stockholders, acting under and with certain statutory powers, and whenever an agreement is entered into by them, in the name of the company, amounting to a breach of their trust, it is void, and will not be enforced to the prejudice of the stockholders. *Field on Corp.* (*Wood's ed.*), § 243, (1st ed., § 273); 1 *Abbott's Dig. Law Corp.*, §§ 652, 653; *Shrewsbury, &c., R. R. Co.* v. *London, &c., R. R. Co.*, 4 *De G., M. & G.* 115; *East Anglian R. R. Co.* v. *Eastern Cos. R. R. Co.*, 11 *C. B.* 775.

The power given to the directors in this case does not authorize them to execute a lease or change the character of the business of the corporation by assuming to operate other railroads. *Green's Brice's Ultra Vires* (2d ed.) 469.

Where the charter of a corporation says that the capital stock shall be $100,000, and may be increased from time to time at the pleasure of the corporation, the directors alone, and without the matter being submitted to the stockholders, have no power to increase it. The fact that the charter declares that all corporate powers of the said corporation shall be vested in and executed by a board of directors, &c., does not alter the case. Such powers to directors refer only to the ordinary business of the corporation. *Green's Brice's Ultra Vires* 469; *Railway Co.* v. *Allerton*, 18 *Wall.* 233.

I submit that this lease, being beyond the corporate power of the defendant to execute, and having been executed by the board of directors without any authority in said board to execute the same, and never having been authorized or approved by the company by its stockholders, is void and of none effect; and that the fact that the defendant below operated the said railroad under said lease for a time, and paid, for the time it so operated said road, a rent equal to the rent reserved by the said lease, cannot in any way validate said lease, nor do these facts estop the defendant below from claiming that the lease is void. The doctrine of estoppel *in pais* does not extend so far as to enable a corporation to do

what in effect is forbidden by law. *Field on Corp.* (*Wood's ed.*), § 243.

If a contract made by a company incorporated for defined and limited objects discloses on the face of it a covenant which if enforced would cause the funds to be appropriated to purposes other than those to which the act says they shall be applied, such agreement cannot be made the foundation of an action. *Taylor on Corp.*, § 291; *Taylor* v. *Chichester, &c., R. R. Co., L. R.*, 2 *Exch.* 356, 370; *Davies* v. *Old Colony R. R. Co.*, 131 *Mass.* 258, 259.

The mere fact that a corporation has received the consideration of or otherwise derived advantage from a contract *ultra vires* does not involve in it any liability on such contract. *Green's Brice's Ultra Vires* (2d ed.) 715, 729, 739.

A lease which a corporation has no power to make does not become valid by the acceptance of the rent, payable by its terms. *Pierce on Railw.* 521; *Field on Corp.* (*Wood's ed.*), p. 390, § 243; *Ogdensburg and L. C. R. R. Co.* v. *Vermont, &c., R. R. Co.*, 4 *Hun* 268, 712; *Ogdensburg and L. C. R. R. Co.* v. *Vermont, &c., R. R. Co.*, 6 *Thomp. & C.* 488; *Ogdensburg and L. C. R. R. Co.* v. *Vermont, &c., R. R. Co.*, 63 *N. Y.* 176, 180.

The fact that a contract *ultra vires* has been executed in whole or in part will not render it valid. An unauthorized conveyance, by a religious corporation, of its real estate cannot be held valid because it has been executed and delivered, the purchaser put into possession and the corporation paid the consideration thereof. *Madison Avenue Church* v. *Baptist Church*, 73 *N. Y.* 82, 90.

The act of the legislature incorporating the Camden and Atlantic Railroad Company was approved March 19th, 1852, and is subject to the provisions of the act of 1846, now section 6 of the act concerning corporations, (*Rev., p.* 178,) as therein amended, which enacted that "the charter of every corporation which shall hereafter be granted by or created under any of the acts of the legislature shall be subject to alteration, suspension and repeal, in the discretion of the legislature."

540    COURT OF ERRORS AND APPEALS.

Camden and Atlantic R. R. Co. v. Mays Landing, &c., R. R. Co.

No act of the legislature has been enacted in terms altering the provisions of the act incorporating said railroad. charter. It may be claimed that such alteration was made by the provisions of the act incorporating the Mays Landing and Egg Harbor City Railroad Company, approved March 23d, 1871. *Pamph. L., p.* 671.

By the thirteenth section of that act it is enacted that it shall be lawful for said company, during the continuance of its charter, to make contracts and engagements with any other corporation or individuals for transporting or conveying any kind of goods, produce, freights, merchandise or passengers, and enforce the fulfillment of such contract.

· This section is almost a copy of section 13 of the act incorporating the Millville and Glassboro Railroad Company, (*Pamph. L.*, 1859, *p.* 210,) and has been construed as conferring no authority to make a lease of the railroad, as not affecting the charter of the company.    *Thomas* v. *Railroad Co.*, 101 *U. S.* 71.

By section 17 of said act, it is enacted "that said railroad is hereby authorized to lease its railroad to, or consolidate with, any other railroad company, which is hereby authorized to take such lease and operate the same for such time or times, and on such terms, as the said parties may agree upon."

I submit this cannot be held to be an amendment to the charter of the Camden and Atlantic Railroad Company until it is in terms accepted by said company as part of its charter.

The charter of a corporation is a contract between the government and the corporation, and as such is protected by the provisions of the constitution of the United States that no state shall pass any law impairing the obligation of contracts.    See *Const. of U. S., art.* I., § 10 ; *Rev., p.* 6 ; *Green's Brice's Ultra Vires, p.* 96, *and notes; Cooley Const. Lim., p.* 279, *and cases cited ; Dartmouth College* v. *Woodward,* 4 *Wheat.* 518.

· It is such a contract that it can only be changed by the assent of both parties thereto.    A mere legislative act changing or altering the character and powers of a corporation

cannot change the charter unless it is assented to by the corporation when there is a reserved right to alter or amend the statute under which corporations are instituted and the legislature, by virtue of such authority, amends the charter or statutes, the corporation has a discretion whether or not to accept the amendment, and the granting of new franchises to an existing corporation is inoperative until accepted. *Field on Corp.* (*Wood's ed.*), § 43, (*1st ed.*, § 50,) *and cases; Green's Brice's Ultra Vires* (*2d ed.*) 98, 469, *and notes.*

An acceptance of amendment of charter must be by the stockholders. *Field on Corp.* (*Wood's ed.*), §§ 43–47; *Green's Brice's Ultra Vires* 98, 158, 469, *and notes; Angel & Ames on Corp.*, §§ 391, 499, 500; *Railway* v. *Allerton*, 18 *Wall.* 233; *Adams* v. *Room*, 52 *Barb.* 399; *Black* v. *Camden, &c., R. R. Co.*, 7 *C. E. Green* 407.

Where alterations of the charter require the corporation to observe certain methods in doing its business or submit to certain burthens, for the benefit of the public, such alterations are mandatory and become operative without the assent or acceptance of the corporation. When the alterations allow, but do not require, the corporation to alter or modify its business, or give to the corporation the right to exercise new and different franchises and powers, such alterations are permissive and require acceptance by the corporation before they become effective. *Green's Brice's Ultra Vires* 98 *w, and cases above cited; Railway Co.* v. *Allerton*, 18 *Wall.* 233.

In this case, as above stated, the Camden and Atlantic Railroad Company never has accepted as an amendment to its charter the power given to any railroad in the seventeenth section of the charter of the Mays Landing and Egg Harbor City Railroad Company, directly or otherwise. As above shown, the Camden and Atlantic Railroad Company, as a company, or by its stockholders, or their authority, has never done any act or thing in any way accepting said powers, directly or otherwise. The action of the directors, as above shown, cannot be held to be an acceptance of such power as part of the charter of the company. The case shows that the

Camden and Atlantic Railroad Company, acting as a company, or by its stockholders, or their authority, never authorized the execution of the pretended lease on which this action is brought, or the covenants therein; that the said company never had the power to make or execute said lease and covenants therein; and that the lease and covenants executed are beyond the power of the said company, and are void and of none effect; and that the judgment of the court below is erroneous and ought to be reversed and for nothing holden.

For the defendant in error, *Samuel H. Grey.*

The plaintiff in error stands on the ground that the lease was *ultra vires* the corporation.

1. Because plaintiff's charter did not authorize the lease, and because section 17 of defendant's charter formed no part of plaintiff's, not having been formally accepted by plaintiff's stockholders.

2. Because if section 17 of defendant's charter did in fact enlarge plaintiff's power, yet that power could only be exercised by the stockholders of plaintiff, and not by plaintiff's directors.

I. It may be premised, as a general proposition of law, that the doctrine of *ultra vires,* where it is invoked by contracting corporations to avoid their contracts, is not favored by the courts. It should not be allowed to prevail where it defeats the ends of justice. *Pierce on Railw.* 519–527; *Railway Co.* v. *McCarthy,* 96 *U. S.* 267; *Thomas* v. *Railway Co.,* 101 *U. S.* 71–86. And so firmly is this principle embedded in the law that all legal presumptions are in favor of the validity of the act sought to be impeached, (unless, I suppose, it be against public policy *malum in se* or *malum prohibitum,*) and its invalidity must be established by the party attacking it. *Magie* v. *Union Township,* 11 *Vroom* 453–455.

Does the case of plaintiff in error show a state of facts strong enough to overcome this aversion of the law to the character of its defence? So far from that being so, it seems to me that the case it presents is one which furnishes in itself the most

cogent and convincing reasons in support of the propriety and necessity of the principle of law above referred to.

It is not pretended that the defendant in error could make, nor plaintiff in error take, a lease without legislative sanction. Both corporations are created by special acts of the legislature—the Camden and Atlantic Railroad Company by act of 1852, (*Pamph. L., p.* 263,) and the Mays Landing and Egg Harbor City Railroad Company by act of 1871. *Pamph. L., p,* 671.

By charter of plaintiff in error, as it originally stood, no power is given to accept this lease, but by the charter of defendant in error (section 17) it is authorized to " lease its railroad to any other railroad company, which is hereby authorized to take such lease and operate the same for such term or time and on such terms as said parties may agree upon." By this act both corporations are enabled, the one to make and the other to take the lease, and the lessee is authorized to " operate " the railroad. The act of 1871 (section 17), upon the making of the lease, became part of the chartered rights and powers of the plaintiff in error to the same extent as if originally contained in its charter. The words of section 17 of the act of 1871 are: " To lease    *    *    *    to any other railroad company," and those words have, by this court, been held to operate as a grant of power to make and take a lease. *Stewart* v. *Lehigh Valley Railroad Co.,* 9 *Vroom* 505.

The same language is used in the General Railroad act, (*Rev., p.* 930, § 105,) where, after authorizing any railroad company to lease or consolidate with another, the act provides, " and such other company or companies are hereby authorized to take such lease," &c.

In New York, under an act passed in 1839, (*Laws of* 1839, *ch.* 213,) which provided that " it shall be lawful hereafter for any railroad corporation to contract with any other railroad corporation for the use of their respective roads, and thereafter to use the same in such manner as may be prescribed in such contracts," it has been held that the power to make and take a lease has been conferred. *Fisher* v. *N. Y. C. &*

*H. R. R. R. Co.*, 46 *N. Y.* 644–653; *People* v. *Albany and Vermont R. R. Co.*, 77 *N. Y.* 232–234.

This act, it will be seen, provides for the use by one corporation of the road of another, in the manner prescribed in the contract for such use. It does not indicate the character of the use, but as a " use " is authorized, the courts hold that a demise is a use and is therefore authorized. It necessarily results that the power to contract for this purpose, and the method of its execution, must have passed from the legislature to the corporations under this general law as part of their charter rights, and the exercise of the power was the only evidence requisite to show its acceptance by the corporations thus availing themselves of the legislative sanction.

It is the public policy of the State of New Jersey, in distributing its franchises, to place them within the reach of all. By general acts applicable to classes of corporations, the power of self-enfranchisement for designated purposes is open to all persons who wish to engage in any character of corporate enterprise. Since the amendment of the state constitution (art. IX., p. 11, § 7) the legislature can " pass no special act conferring corporate powers, but they shall pass general laws under which corporations may be organized and corporate powers of every nature obtained, subject, nevertheless, to repeal or alteration at the will of the legislature." Free trade in franchises has become the rule in New Jersey now, and for nearly forty years the legislature has asserted its control over its creatures.

Ever since 1846 all charters have been granted by the legislature and accepted by corporations upon condition that the legislature may alter, suspend or repeal them at its discretion. This condition was and is as much a part of the contract under which this corporation was created as if it had been incorporated in the charter. If, then, the Camden and Atlantic Railroad Company accepted its charter upon this condition, how can its acceptance or rejection of subsequent legislation, which " alters " its original charter, affect the case? If the formal action of the company in accepting

JUNE TERM, 1886. 545

Camden and Atlantic R. R. Co. .v. Mays Landing, &c., R. R. Co.

legislative changes is necessary to effectuate them, then the hostile action of the company in rejecting legislative alterations in its charter may defeat legislative action. If this be true, the stream has risen higher than its source—the creature is superior to the creator—the corporation, which the legislature has vitalized, and whose existence depends upon the sovereign power, not only lives by force of its own inherent vitality, but is a law unto itself, measuring its own capacity, and exercising such functions as its interest, its necessities or its rapacity may dictate. Where the legislative change is mandatory, the doctrine as I have stated it is admitted to be the rule of law in the authorities cited by the plaintiff in error. It is claimed, however, that where the legislative change is permissive only, action by the corporation is necessary to effectuate it. This is upon the principle that where an investment is made in a corporate enterprise, for a specified time and purpose, the capital thus employed cannot be diverted to another and a different purpose by legislative permission alone, but the assent of the investor, the stockholder, is necessary. Such is the doctrine of *Zabriskie* v. *Hackensack, &c., R. R. Co.*, 3 *C. E. Green* 177, approved by this court in *Black* v. *Delaware and Raritan Canal Co.*, 9 *C. E. Green* 456, 466.

In the case at bar, the original enterprise outlined in the charter of the plaintiff in error contemplated the construction of the leased road as a branch of the road of plaintiff in error. *Pamph. L.*, 1852, *p.* 263, § 6. It was then intended by the Camden and Atlantic Railroad Company, and by its stockholders, that this leased road should be built by it in execution of its charter power. It became, by reason of its embarrassments, unable to exercise this power. Under these circumstances, plaintiff in error " obtained a separate charter," under which defendant in error was organized for the purpose of thus accomplishing one of the very objects for which plaintiff in error was chartered, and which, by reason of its " financial difficulties," it was obliged to " abandon." The doctrine of the cases cited in plaintiff's brief can scarcely be held applicable to this state of facts. Here, there was no diversion

of capital to a purpose foreign to the original objects of the corporation, but after an exhaustion of its original investment, without the accomplishment of these objects, it procured another corporation, to be created for, and to invest new capital in, attaining these very purposes, and when they are thus reached it takes by this lease all the benefits and advantages which it had expected to reap from its original charter.

It is perfectly obvious that the provision of section 17 of defendant's charter was intended to afford plaintiff the opportunity to utilize defendant's capital to build this leased road, for the purpose of enabling plaintiff to lease it when built. Plaintiff's charter powers to establish this leased road as a branch of its main line were not changed, but the method of exercising them was changed. When plaintiff exercised the power to lease, it accepted, if acceptance were necessary, the provisions of this section as a part of its own charter. It became possible, by this legislation, for plaintiff to enjoy the benefits which its main line would acquire from the ownership of this feeder which it had not the money to build. It became, by lease, the owner of the road; for such a term—nine hundred and ninety-nine years—has been held by this court to be equivalent to absolute ownership. *Black* v. *Delaware and Raritan Canal Co.*, 9 *C. E. Green* 456. What difference can it make whether that ownership which the charter authorized was acquired by construction of the road or by a lease of it? The practical result of this legislation was that a new corporation, defendant in error, created at the instance of plaintiff in error, loaned the money to plaintiff in error to build this leased road. This loan plaintiff in error took and expended it on this leased road, which by the lease it added to the assets which it owned. The investment they made is not so profitable as it was expected to have been, and plaintiff in error does not want to pay its debt simply because it has not made as much money from its investment as it had hoped for.

If any acceptance or action by plaintiff in error were necessary to make the provisions of section 17 of defendant's charter

a part of its own, the act of leasing the road was enough. How could it exercise a power derived only from and conferred upon it by this section, and at the same time deny that it possessed the power thus conferred and exercised?

The claim that the action of the shareholders, as such, is the only evidence of the acceptance of this legislation as part of the charter which the law recognizes, is not, I think, well founded. I think it will be seen, and is hereafter clearly shown, that the directors of plaintiff in error were the only agencies by which it could act. They derive their power from the charter. The stockholders, as to the matters committed to the directors, are impotent. *Pamph. L.* 1852, *p.* 263, §§ 5, 6. The charter not only confers on the directors the power to "transact all business of the corporation," (section 5,) but invests the president and directors with "all rights and powers necessary and expedient to survey, lay out and construct a railroad." Section 6. *Dayton and Cincinnati R. R. Co.* v. *Hatch,* 1 *Disn.* 84.

II. The power of the two corporations being then settled, the only question to be considered is as to the method of exercising that power. Plaintiff in error claims that the lease is void because not primarily authorized by the "company," *i. e.,* the stockholders. If this were true it would avoid nothing.

1. Because the contract has been performed. *Whitney Arms Co.* v. *Barlow,* 63 *N. Y.* 62; *Moraw. on Corp.,* §§ 31, 86, 100; *Pierce on Railw., pp.* 516, 517, *and notes; Ward* v. *Johnson,* 95 *Ill.* 215; *Darst* v. *Gate,* 83 *Ill.* 137; *Field on Corp.* (*Wood's ed.*), §§ 231–236; 6 *Am. Corp. Cas.* (*Binmore*) 462–467, *and notes.*

2. Because the company (lessee) has estopped itself, before the lease and by its agreement with the lessor, recited in the lease, from denying the validity of the lease; and since the lease, it has, by taking possession of the demised premises, by using them as part of its line of railroad, by reporting to its stockholders from year to year, and every year, the receipts from and expenditures on the demised railroad, the lessee company has in every way assented to and acquiesced in this

lease. *Taylor on Corp.*, § 270; *Pierce on Railw.*, *pp.* 518, 519; *Moraw. on Corp.*, §§ 46, 47, 48, 71, 78, 79, 80, 81, 82.

A corporation that knowingly receives the fruits of an excessive exercise of authority of its agent is held to have ratified the act. *Mining Co.* v. *King*, 45 *Ga.* 34; 4 *Am. Corp. Cas.* 344.

After seven years' acquiescence in the lease, something more must be shown than that it was executed in excess of the power of the directors. *Pneumatic Gas Co.* v. *Berry*, 113 *U. S.*, 322, 327.

The complaint on this point is not that the company was without power to enter into the contract of lease, but that the proper agencies to bind the company were not used. Such a position as this is not favored by the law and finds no support in settled legal principles. *Green's Brice's Ultra Vires* 515, 516, *note a; Conn. Mutual Life Ins. Co.* v. *Cleveland R. R. Co.*, 41 *Barb.* 8.

But it is not true that the lease was not primarily authorized by the "company," *i. e.*, the stockholders. The lease was originally the act of the lessee company, plaintiff in error.

No corporation conducting the business of carrying freight and passengers by rail can act, except through and by its agents and servants. Principal among such agencies, and controlling all others, are the directors or managers of the corporation. *Moraw. on Corp.*, § 36.

It is the common law of corporations that the administration of their affairs, except where expressly provided otherwise, is committed to a board of directors. *Green's Brice's Ultra Vires* (2d ed.), *ch.* 4, *p.* 467, *and notes.*

The acts of directors as agents, within the scope of ordinary powers, bind the corporation. *Moraw. on Corp.*, §§ 65, 71.

"The president and directors," says Chief Justice Marshall, in *U. S. Bank* v. *Dandridge*, 12 *Wheat.* 113, " are constituted agents of the corporation and not of the stockholders, and derive all their authority from the charter."

It is the universal rule that the directors are agents of the

corporation, although trustees for the stockholders. *Thomp. on Corp. Off., pp.* 351, 352.

But in this case, the charter of the plaintiff in error speaks in no uncertain terms. The directors are expressly authorized (*Pamph. L.*, 1852, *p.* 263, § 5) "to transact all business of said corporation." They alone, by the provisions of this charter, are authorized to make the by-laws, which, subject to the charter, are to control the action of the company. And it is to the president and directors that the legislature has committed the power "to survey, lay out and construct" the railroad. Section 6.

Here, then, is a case where the corporation acts directly through an agency designated by its charter. And this agency, I submit, was exclusive of all others.

In *Conro* v. *Port Henry Iron Co.*, 12 *Barb.* 63, the Supreme Court of New York say : "It is quite obvious from the charter that the company could do no act except through its board of directors. When the charter prescribes the mode of action, its injunctions must be rigidly pursued. * * * Every corporation created by statute must act as the statute prescribes, and the common law cannot control by implication that which the legislature has expressly sustained. The stockholders in this case had no power to make a lease or do any other administrative act in the management of the affairs of the corporation. If a lease could be made at all, it could be executed only in pursuance of the act of the directors, who are the body appointed by the charter for the management of its affairs."

The language here used by the New York court is identical with that used by Mr. Justice Story, in *Fleckner* v. *U. S. Bank*, 8 *Wheat.* 357, 358. In that case, it was objected that a corporation could evidence its action only by its corporate seal. Judge Story says: "Whatever may be the original correctness of this doctrine, as applied to corporations existing by the common law, in respect even to which it has certainly been broken in upon in modern times, it has no application to corporations created by statute whose charters contemplate

the business of the corporation to be transacted exclusively by
a special body or board of directors, and the acts of such body
or board, evidenced by a written vote, are as completely
binding upon the corporation, and as complete authority to
their agents, as the most solemn acts done under the corporate
seal;  *  *  *  and in the case of *Bank of Columbia* v. *Pat-
terson,* 7 *Cranch* 299, *Mechanics' Bank of Alexandria* v. *Bank
of Columbia,* 5 *Wheat.* 326, principles were established which
settle the point that the corporation may be bound by con-
tracts  *  *  *  made in the ordinary discharge of official
duty of its agents and officers." See, also, *Green's Brice's
Ultra Vires, p.* 463, *and cases cited.*

The powers of directors, exercised within the powers con-
ferred by the charter on the corporation, to act for and bind
the corporation, are sustained and illustrated in the following
cases in addition to those cited by Mr. Green, in his note
above referred to: *Middlebury* v. *Rutland R. R. Co.,* 30 *Vt.*
425; *Hoyt* v. *Thompson,* 19 *N. Y.* 207; *Augusta Bank* v.
*Hamblet,* 35 *Me.* 491; *Bank of Middlebury* v. *Edgerton,* 30
*Vt.* 182; *Whitehall* v. *Warner,* 20 *Vt.* 405; *Protection Life
Ins. Co.* v. *Foote,* 79 *Ill.* 361; *Union Ins. Co.* v. *Keyser,* 32
*N. H.* 313; *Hodder* v. *Kentucky and Great Eastern Railway
Co.,* 7 *Fed. Rep.* 793.

The doctrine of the law, as illustrated by these cases, is that
where the legislature has, as here, designated the method for
the exercise of corporate power, that method so designated is
the only one by which the power conferred can be exercised.

The board of directors of plaintiff in error being the agency
prescribed by its charter for the transaction of " all business,"
it is the only channel through and by which the corporation
could act. Having acted through this agency, the company
has acted, and its power to make this lease has been fully and
lawfully exercised.

It is by no means certain, but, on the contrary, strongly
probable, that when this lease was made it was the act of
holders of the majority of all the shares. The board then
contained those who owned the road.

The plaintiff in error assigns error on the admission of illegal and rejection of legal evidence. Only few exceptions were taken to evidence. I do not think it necessary to discuss any of them. The case seems to me too clear to be clouded by any such questions as those exceptions suggest.

It may be proper to refer to an authority covering the exception.

*Thomas* v. *Horse Railway Co.*, 104 *Ill.* 462, supports the court's ruling on this point. And see, also, *Kenton Furnace Co.* v. *McAlpin*, 5 *Fed. Rep.* 737–748.

I submit that the judgment of the Supreme Court should be affirmed.

For the plaintiff in error, in reply, *Wayne Mac Veagh*, of Pennsylvania.

Upon the facts of record the claim of the defendant in error is without merit.

The effort of the defendant in error is to make the plaintiff in error pay the alleged rental value of railroad property after it has been surrendered to the owner upon due notice, and abandoned, and after the valuation for use during a previous occupancy has been fully paid up to the date of surrender.

In the court below permitting the plaintiff to recover as for a valid claim, this attempt at extortion, we may confess, was given some dignity. But it is submitted with deference that a careful consideration of the case will show palpable error in the action of that tribunal. To the two central propositions advanced by the plaintiff in error that the so-called lease was *ultra vires*, or if not actually *ultra vires*, was improperly executed so as not to bind the company, defendant in error makes several replies.

1. That the lease, although unauthorized by the charter of the plaintiff in error, is to be upheld on the authority of a clause in the charter of the defendant in error permitting any company to take the lease and operate the road.

2. That if the lease is actually *ultra vires* or is not properly

executed, it must still be recognized as valid, "because the contract has been performed."

3. That the plaintiff in error is estopped by its conduct from asserting the invalidity of the lease.

4. That if the taking of the lease was not *ultra vires*, the the action of the directors, without formal action of the stockholders, was sufficient to effect a valid assumption of it.

1. The singular proposition upon which the defendant in error relies is that the chartered rights and powers of one railroad company are to be determined by an inspection of the act of incorporation of another, and that a general permission to railroad companies to accept a lease from this particular company establishes the validity of a particular lease, regardless of the methods of assuming the obligations of the lease or of the rights of the stockholders of the company undertaking the lease.

This view eludes a consideration of the dual theory upon which charters are based. A charter establishes not only a power, but also a right—a power to act under the franchise, and a right to protection in the exercise of the franchise.

When a legislature assumes to modify, extend or amend the charter of a company, in the exercise of its right under general laws in force at the time of the charter, it may do so by enacting a compulsory or a permissive enlargement of the corporation powers. But when by a permissive clause contained, not in an avowed amendment to the charter, nor in a general corporation law, but in the charter of another company, it declares it to be legally possible for any corporation to take a lease of the other line, such enlarged power is perfected only when it has been formally accepted by the stockholders of the company seeking to avail itself of the permissive enactment. This is so because the charter of the company, as originally constituted, establishes rights as well as declares powers—rights of stockholders *inter sese*, and as related to the general enterprise in which they invested their money, no less than powers which concern the corporation as a whole.

The selection by the legislature of a permissive instead of a

compulsory form of enactment, shows that it has not exercised its right to extend the corporation powers, but has left it to the corporation, by a formal acceptance of the act, to co-operate with it in enlarging those powers. The powers are not enlarged, therefore, until some action of the stockholders in co-operation with the legislature has been had. And their rights and the rights of the company under the original contract of incorporation remain and are to be respected, so long as the legislature, by withholding its compulsory arm, maintains to the corporation the protection of the rule of inviolability of contracts as asserted in the Dartmouth College case. Indeed, in this state especially, it is not disputed that some action of the stockholders is necessary to alter a charter where the legislature passes a permissive act, the general inquiry being rather, whether it is necessary for all the stockholders or only a majority to join.

"Permissive alterations are such as allow, but do not require, the corporation to alter or modify its business. * * * Such alterations require acceptance, and the question arises whether they may be accepted by a majority of the stockholders against the will of a minority." *Green's Brice's Ultra Vires* 98, *and cases cited; Zabriskie* v. *Hackensack and New York R. R. Co.,* 3 *C. E. Green,* 178.

Counsel for the defendant in error, apparently conceding this position, endeavors to show that when the line which the directors of the plaintiff in error have undertaken to lease, happens to coincide in its direction and termini with a branch line which it would have been possible for the latter, under their charter, to have constructed for themselves, an acceptance by stockholders of the permissive legislative act is unnecessary to render the lease *intra vires.* The argument relied on for this is that the building of such a branch line was in contemplation at the time of the organization of the company, and the acquisition of the branch by lease was therefore no diversion of capital to a purpose foreign to the original objects of the corporation. The answer to this is obvious. It is just as essentially a diversion of capital to direct it into a contem-

plated channel in a manner or in amounts different from that for which there is charter authority, as if the geographical *locus* of the investment were other than that allowed by charter. The original stockholders of the Camden and Atlantic Railroad Company accepted a charter from the state, which permitted them to construct a branch line from Mays Landing to Egg Harbor City, but which did not permit them to take a lease of such a line. This the defendant in error concedes.

Unless "to construct" is to be interpreted as including in its meaning "to take a lease of," the investment of capital in this lease must be held to have been a diversion.

The stockholders may very well have been willing to build for themselves and to have invested their money in construction, and yet not to have contemplated with favor the acceptance of a lease with its enforced burdens. *Non constat* that as good a road could have been leased, or could have been leased as cheaply, as one could have been built by the stockholders themselves. It would seem to be useless to show that the leasing of the road was a diversion of capital, when counsel for the defendant in error acknowledges that by the original charter the capital was to be used only for certain purposes, among which was not the leasing of this road. The very fact that, for counsel to make out a plausible argument, it is necessary for him to rest upon the permissive powers granted to the plaintiff in error by a subsequent legislative enactment which means nothing to the present purpose, unless it is an amendment to the original charter, would itself show that there must have been some action of the stockholders in acceptance of the legislation before the power to take a lease under it was *intra vires* as to them. The law permitting the amendment was, in fact, a law offering them a new charter. If it was necessary for the stockholders to act in obtaining the charter in the first place, surely it was likewise necessary for them to express their assent before the burdensome obligations of a radically amended charter could be foisted upon them.

The argument in the brief of the defendant in error, that the power to accept the amendatory legislation was, by the

charter, given to the directors only, is of little force. Grant-
ing for the present, for the sake of the argument, that the
powers given to the directors by the original charter, "to
transact all business of the corporation," extended beyond the
ordinary business of organizing and administering the affairs
of the railroad company, no ingenuity in the interpretation of
language can extend the effect of this phraseology to the grant-
ing of an authority to them to accept a vital amendment to
the charter. The power "to transact all business" can mean no
more than the power to transact all business contemplated by
the stockholders when they accepted the original charter. If
the charter itself failed to contain a provision for the leasing
of other roads, and in no way provided for a change in the
internal law of the company by which such a lease could be
effected without initial external legislation leading up to it,
until acceptance of amendatory legislation by the stockholders
is made, the phrase "all business of the company" is to be
confined to the business allowed, because contemplated, by the
stockholders when they accepted the original charter. To
permit a board of directors, elected for the transaction of the
business of a corporation with one set of powers, to accept an
amendment by which a corporation with another set of powers
is created, is to permit them to accept away the very property
of the stockholders, which no court of justice will permit.

2. The objection that the contract of lease has been executed,
and that therefore the defences of *ultra vires* and of improper
execution will not avail, is answered by the facts. So far as
the contract is executed there is no controversy between the
parties, all amounts due for rents accruing during actual use
of the property up to February, 1882, having either been paid
to the defendant in error or paid into court for its use. The
actual controversy is over the unexecuted portion of it, namely,
for the payment of money alleged to be due after surrender
of the property by the plaintiff in error. The language of
Mr. Justice Miller, in *Thomas* v. *Railroad Co.*, 101 *U. S.*
86, a case very similar in its facts to our own, may be quoted
with little modification in the present connection: "What

is sought in the case before us is the enforcement of the unexecuted part of this agreement. So far as it has been executed, namely, the four·or five years of action under it, the accounts have been adjusted, and each party has received what he was entitled to by its terms. There remains unperformed the covenant to arbitrate with regard to the value of the contract. [In our case there remains unperformed the payment of rent since the surrender of the property to the· owner.] It is the damages provided for in that clause of the contract that are sued for in this action. Damages for a material part of the contract never performed, damages for the value of a contract which was void. It is not a case of a contract fully executed. The very nature of the suit is to recover damages for its nonperformance. As to this, it is not an executed contract."

3. The objection that the plaintiff in error is estopped by its actions from refusing to be bound by this protracted lease is likewise untenable.

If the taking of the lease was *ultra vires*, the doctrine of estoppel has no application. It is a rule of law that no corporate power exists except such as is conferred by the charter. If a corporation, by the performance of acts *ultra vires*, can estop itself from asserting their invalidity, it can make itself practically omnipotent and independent of charter restrictions, by simply acting and inducing others to change their positions or waive rights in consequence thereof. Such a doctrine, as was said in *Wheeler* v. *Essex Public Road Board,* 10 *Vroom* 291, would obliterate almost entirely the salutary principle that an act which is beyond the corporate competency is, for all purposes, null. See *Green's Brice's Ultra Vires* 729, *notes*.

Even if the taking of the lease was not *ultra vires*, it is submitted that from the facts of the case, no estoppel can be invoked to prevent the company from refusing to be further bound by the excessive exercise of authority by the directors.

An estoppel in *pais* occurs when a party to an action has, by his act or declaration, induced the other party to do or omit to do some act or acts which otherwise would have been

done or omitted, and by means of which he has been injured. *Reynolds* v. *Garner,* 66 *Barb.* 310.

Where the parties can be, and are, put back in the situation in which they were when they made the contract, and all demands and liabilities accruing during the executed period of the contract have been adjusted, it is difficult to see on what principle one of them is to be denied the right to defend his liability for the subsequent rent of a property which the other party has received back. There is no injury of which the defendant in error may complain for which it is not compensated in the return of its property. Until it shows that it has been prejudiced, as by the loss of earnings or by the failure to effect a valuable lease to another road, or the like, through the undertaking of the directors of the plaintiff in error, it should not be permitted to avail itself of a principle of law which exists only for those who have suffered substantial wrong from the acts or representations of others.

4. The words of the charter of the company, in which counsel finds authority in the directors to negotiate and execute this lease, scarcely sustain his position.

"The power to change fundamentally the character or extent of a corporation is not contained in the power vested in the board of directors to manage the business or affairs of the company." *Green's Brice's Ultra Vires* 469.

The judicial utterances apparently favoring his view, which the industry of the learned counsel has enabled him to collate, are shorn of much of their force when separated from the facts of the cases to which they were meant to apply.

It is believed that the principle which they declare will be found to go no farther than that the directors of a corporation are entitled to exercise the powers plainly granted to them in the charter; but that no generality of language used in the charter, and referring to the detail management of the affairs of the company, can be magnified into an authority in them absolutely to control, to dispose of, and, by extending, to destroy the value of the franchise in which the stockholders who constitute the company have invested their money.

But the *ultra vires* character of all the transactions of the directors of this company as to this lease must not be lost sight of in pursuing inquiries as to their power within *intra vires* bounds.

Confessedly, there was no formal acceptance, by stockholders, of legislation permitting the taking of this lease. Confessedly, there was no such acceptance by the directors themselves. The attempt to establish an acceptance, by the act of the directors in proceeding to effect the lease, falls before the view that the directors were neither the company nor the majority of the stockholders of the company. The similar effort to have an acceptance inferred from the silence of the stockholders during several years likewise becomes abortive when it appears that the stockholders, as soon as they were informed of the so-called lease, took steps to have it repudiated. If their alleged "acquiescence" during the period of actual use of the property by the plaintiff in error be of avail to either of the parties to this suit, it cannot make valid the lease if it was originally *ultra vires* for want of an acceptance of the act which permitted it. It cannot relieve the plaintiff in error of its duty to withdraw from the lease when discovered to be *ultra vires*. It cannot give a right of action under the lease for sums accruing after repudiation of the lease and after the property was surrendered and abandoned. Such is the ruling of the court of highest resort in this country, and such we assert to be the law. In the language of Mr. Justice Miller, in *Thomas* v. *Railroad Co., supra*, "having entered into the agreement, it was the duty of the company to rescind or abandon it at the earliest moment. * * * Though they delayed its performance for several years, it was nevertheless a rightful act when it was done. Can this performance of a legal duty, a duty both to the stockholders of the company and to the public, give to plaintiffs a right of action? Can they found such a right on an agreement void for want of corporate authority and forbidden by the policy of the law? To hold that they can is, in our opinion, to hold that any act performed in executing a void contract makes all its parts

valid, and that the more that is done under a contract forbidden by law, the stronger is the claim to its enforcement by the courts."

It must not be forgotten, too, that this defendant in error has received every dollar of rent due it in equity for use of its property up to the time of abandonment. To permit it by judicial finding to recover both the property, which has been surrendered, and the half-yearly value of the property after surrender, is to legalize extortion, and is to make this high court of justice an instrument of injustice.

VAN SYCKEL, J. This was an action of debt brought in the Supreme Court, to recover the rent alleged to be due from February, 1881, to June 1st, 1882, on a lease of its road executed in 1873 by the defendant in error to the plaintiff in error, for the term of nine hundred and ninety-nine years. The Mays Landing and Egg Harbor road was built under a charter obtained in 1871, and since its completion in 1872 it has been in the possession of the Camden and Atlantic Company as lessee, until February, 1881, at which time the latter company ceased to operate it, and refused to recognize the validity of the lease.

The defence to the action is rested upon the want of power in the lessee company to execute the lease.

The Camden and Atlantic Railroad was completed from Camden to Atlantic City in the early part of 1862, under a charter granted in 1852. This road I will hereafter, for brevity, style the main line, and the Mays Landing and Egg Harbor road, the branch road.

The branch road rests its own authority to make a lease, and the authority of the main line to accept a lease, upon the seventeenth section of the charter of the branch, which provides that the said branch road is authorized to lease its railroad to, or consolidate with, any other railroad company, which is thereby authorized to take such lease and operate the same for such time or times, and on such terms, as the said parties may agree upon. This language is unquestionably broad

enough to confer upon both companies the power requisite to enter into a valid contract for a lease, and no doubt could arise in this case if the powers of one railroad company can be amplified by provisions in the charter of another.

The title of the act incorporating the branch road is: "An act to incorporate the Mays Landing and Egg Harbor City Railroad Company." Under that clause of our state constitution which provides that "to avoid improper influences which may result in intermixing in one and the same act such things as have no proper relation to each other, every law shall embrace but one object, and that shall be expressed in the title," can the seventeenth section of the branch road charter be upheld so far as it purports to confer additional franchises upon other railroads? It seems to me to be very clear that this question must be answered in the negative.

This charter manifestly embraces two distinct objects: it confers power upon the branch road to construct its line and to lease it, and attempts to enlarge the authority of all other railroad corporations by permitting them to accept a lease. There is no indication in the title that such legislation was contemplated. The constitutional restraint could not be invoked for a more salutary purpose than to suppress a scheme to amplify corporate powers in a way which effectually conceals the intention to do so. *Jersey City* v. *Elmendorf*, 18 *Vroom* 283.

So far as the grant of authority to the main line is concerned, the seventeenth section is unconstitutional. The necessary power to the main line, if it exists, must be sought for in its own charter.

The Camden and Atlantic road had authority, under its charter, to build the branch road from Mays Landing to Egg Harbor City, but, as before stated, did not exercise that right, the branch road having been constructed under a charter subsequently granted in 1871.

In *Branch* v. *Jessup*, 106 *U. S.* 468, Mr. Justice Bradley held that the power granted to a railroad company to construct a particular line of railroad carried with it by implication the

right to purchase such line of railroad subsequently built by another corporation. The doctrine, I think, is sound, and the right to lease for nine hundred and ninety-nine years would co-exist with the right to purchase. This would establish the power of the main line to enter into the lease if the right to construct the branch had survived until the lease was executed. But by reference to the seventeenth section of the charter of the main line, (*Pamph. L.* 1852, *p.* 271,) it will be observed that its power in this respect expired by limitation on the 1st day of August, 1862. The section reads as follows : · " That if the said railroad shall not be completed and in use at the expiration of ten years from the 1st day of August next ensuing, that then and in that case this act shall be void."

Under the rules which apply to the construction of legislative grants of power, the only interpretation which this language will reasonably bear is that the authority derived through the charter must be exercised within ten years from August 1st, 1852, and that such portion of the road as should not then be constructed could not thereafter be built under the granted authority.

In *Morris and Essex R. R. Co.* v. *Central R. R. Co.*, 2 *Vroom* 205, it was expressly adjudged that the power of a corporation to take the land of an individual is determined by the expiration of the term limited for its exercise, after which the right of eminent domain derived from its charter no longer exists in the company.

The branch road was not constructed until the year 1871, nine years after the expiration of the time limited to the main line for the enjoyment and exercise of its granted powers. At that time the main line, having no longer the right of eminent domain, was without the power to build the branch road, and consequently in the loss of that authority is involved the deprivation of all power which would flow from it. It must therefore be conceded that the execution of the lease on the part of the Camden and Atlantic road was *ultra vires.*

The rule is well settled, both in England and in this country, that an executory contract, *ultra vires,* cannot be validated

by the acquiescence of every stockholder of the company.    It is also generally conceded that an *ultra vires* contract fully executed cannot be receded from.    *Field on Corp.*, §§ 263, 264; *Green's Brice's Ultra Vires* 371, 372, 373; 1 *Wood on Railroads*, §§ 171, 172, 173; *Thomas* v. *Railroad Co.*, 101 *U. S.* 71.

The courts have differed upon the question whether the plea of *ultra vires* is available by a corporation in an action brought against it for not performing its side of the contract, where the transaction is complete, and nothing remains to be done by the party seeking relief.

*Ashbury Railway Co.* v. *Riche*, 7 *H. of L.* 653, is the leading English case.

The company, by its directors, entered into an agreement with Riche to give him the construction of a railway from Antwerp to Tournay.    After Riche had entered upon the work, and executed it in part, the company repudiated the contract as one *ultra vires*.

Riche then brought an action to recover damages for breach of contract.

The case was referred to a barrister to state a special case, and the question of *ultra vires* was that on which the decision was to depend.    The court was to be at liberty to draw inferences of fact.    In the Court of Exchequer two of the three judges were of opinion that the plaintiff should have judgment, and when the case came before the Exchequer Chamber it was heard before six judges, who, being equally divided in opinion, the judgment was affirmed.    On appeal to the house of lords, the judgment was reversed, pronouncing the contract *ultra vires*, and declaring that it was without the power of the shareholders to validate it by their acquiescence.    Mr. Justice Folger, in 78 *N. Y.* 187, distinguishes the English case on the ground that the contract with Riche was prohibited by an act of parliament.    Although the court did not rest its decision on that ground, Lord Chelmsford adverted to that fact to distinguish the cases of Spachman *v.* Evans and Evans *v.* Smallcomb, where the act of the directors was not prohibited

JUNE TERM, 1886.            563

Camden and Atlantic R. R. Co. v. Mays Landing, &c., R. R. Co.

by statute, but was merely not warranted by the deed of settlement of the company. In affirming the judgment now under review it is not necessary to dissent from the conclusion reached in this case. The agreement with Riche was not fully executed on either side, and it was one in which payment to him of the money he had expended in behalf of the company under the agreement, would have done complete justice. The suit being for damages for breach of the contract, would have embraced profits which might have resulted from its execution. If the suit had been maintained it would have given the plaintiff a measure of relief greater than was necessary to restore him to the *status* he occupied before the contract was made.

In *Parish* v. *Wheeler*, 22 *N. Y.* 494, Chief Justice Comstock, in delivering the opinion of the court, said that a corporation cannot defend itself against a claim for money paid at its request to one who advanced the price of a steamboat purchased for it, on the ground that the purchase was *ultra vires*, although the plaintiff, when he paid the money, knew all the facts. He declared that corporations, like individuals, in dealing with other parties, must live up to the rules of common honesty.

In the previous case of *Bissell* v. *Michigan Southern R. R. Co.*, 22 *N. Y.* 258, the same learned judge expressed the view that where a corporation has received the consideration of its unauthorized contract, and restitution will not do complete justice, the other party may sue directly on the contract.

He said that the plea of *ultra vires*, according to its just meaning, imports, not that the corporation could not make the unauthorized contract, but that it ought not to have been made. Such a defence therefore rests upon the violation of trust or duty towards the shareholders, and is not entertained where its allowance will do a greater wrong to innocent third parties. The acquiescence of the shareholders in the abuse will prevent the interposition of such a plea. This case was decided without an expression of opinion by a majority of the court on this point, but in the later case of *Kent* v. *Quick-*

*silver Mining Co.,* 78 *N. Y.* 159, Judge Folger delivered the opinion, in which the entire court concurred, giving the fullest approval to the views of Chief Justice Comstock, in the cases cited. The case was one in which the directors had done an act which the company had no power to do, and in which there was not full execution on both sides. It was not of that class of cases where an authorized act was executed in an unauthorized manner. The transaction was clearly *ultra vires,* and in that aspect it was dealt with by the court. The English and American cases were cited, and the cause was ably and elaborately argued.

The propositions maintained by the court were that acts of a corporation, which are not, *per se,* illegal, or *malum prohibitum,* or contrary to public policy, but which are *ultra vires,* affecting only the interests of stockholders, may be made good by the assent of shareholders, so that strangers to them, dealing in good faith with the corporation, will be protected in reliance on those acts.

That it needed not that there be an express assent upon the part of shareholders to work an equitable estoppel upon them. When they neglect to promptly and actively condemn the unauthorized act, and to seek judicial relief after knowledge of it, their acquiescence will be presumed.

That when the public is concerned to restrain a corporation within the limit of the power given to it by its charter, an assent of the stockholders to the use of unauthorized power will be of no avail.

In *Whitney Arms Co.* v. *Barlow,* 63 *N. Y.* 62, the Court of Appeals of New York enforced the *ultra vires* contract against the other party where it had been performed on the part of the corporation. In addition to the estoppel, which in that case applied to the person dealing with the company, it is true that none of his rights were infringed by the fact that the transaction was *ultra vires* the company, and he could not, for that reason also, interpose that defence. But where shareholders are chargeable with consenting to an undertaking which they have permitted to be executed, they waive their

pre-existing rights, which would be affected by the unautho-rized act, and became equally subject to the estoppel.

Chief Justice Ruger, in *Woodruff* v. *Erie Railway Co.*, 93 *N. Y.* 609, in an opinion from which there was no dissent, gave his full approval to the previous cases, and held that under an *ultra vires* lease the lessee is estopped from question-ing its validity in an action to recover the stipulated rent.

In *Bradley* v. *Ballard*, 55 *Ill.* 413, Chief Justice Lawrence said that when the contract is executed the doctrine of estop-pel is applied for the purpose of compelling corporations to be honest, in the simplest and commonest sense of honesty, and after whatever mischief may belong to the performance of the *ultra vires* act has been accomplished. The case was one in which money was borrowed and notes given by a corporation, to enable it to prosecute a business which the lender knew it had no right to undertake.

In *Terry* v. *Eagle Lock Co.*, 47 *Conn.* 141, the Eagle Lock Company entered into an unauthorized agreement with an-other company to purchase its stock and run it as a separate company. The Connecticut court held that after the contract had been executed and the defendant company had been per-mitted for five years to transact business under the arrange-ment, it would not be interfered with.

In *McCutcheon* v. *Steamboat Co.*, 13 *Penna.* 13, a foreign corporation had taken a lease of real estate without authority in its charter, and in an action for the rent, the court enforced the contract.

In *Darst* v. *Gale*, 83 *Ill.* 137, the Peoria Marine and Fire Insurance Company executed a deed of trust to secure payment of certain bonds upon which the company had received the money. The bill was filed to enjoin the trustee from selling the premises, and to declare the deed of trust void. The court refused to allow the plea of *ultra vires* to prevail, on the ground that a private corporation cannot be heard in such a defence where the contract has been performed by the other party and the corporation has had the benefit of the contract and the performance. The language of Chief Justice Law-

rence in Bradley v. Ballard was cited with approbation: "That it would be pressing the doctrine of *ultra vires* to an extent that can never be tolerated, even though the lender knew that the corporation was transacting a business beyond its corporate powers, provided the business itself was free from any intrinsic immorality or illegality."

These views were re-affirmed in *Ward* v. *Johnson*, 95 *Ill.* 215, and in *Peoria Road* v. *Thompson*, 103 *Ill.* 187.

In *Amerman* v. *Niles*, 9 *C. E. Green* 13, the Chancellor refused to entertain the defence of *ultra vires* to a mortgage executed by a corporation to secure a debt to the defendants.

*Thomas* v. *Railroad Co.*, 101 *U. S.* 71, is relied upon by the plaintiff in error. In that case the lease was held to be *ultra vires*, and therefore void.

Mr. Justice Miller, for the court, referred to the English cases, and said that although the American cases were conflicting, the preponderance of authority was that an *extra vires* contract, but partly executed, could not be enforced. He, however, held the lease there to be contrary to public policy, for the reason that the lessor company had no power to make the lease, and that thereby it disabled itself to perform the duties which it had undertaken in accepting its charter from the state, and he therefore treated the contract as one forbidden by the law. He did not question that the lessee would be liable for the rental for the period during which it had enjoyed the term.

It is to be observed in this case that by the surrender of the lease the lessor was left in his former position, and the rental being paid, no apparent injustice was done.

In the case of the *Mutual Life and Fire Insurance Co.* v. *McKelway*, 1 *Beas.* 133, the defendant was unsuccessful in his attempt to recede from his contract, but it was not a suit by one of the parties to the unauthorized contract to enforce it against the other. The proceeding was instituted in behalf of corporators as to whom, the learned jurist who decided the case was careful to observe, that it did not appear that they insured upon the faith of the *ultra vires* contract, or that they

Camden and Atlantic R. R. Co. v. Mays Landing, &c., R. R. Co.

became corporators after the contract was entered into, or in consequence of it.

In the conflict of judicial decision on this subject, this court may adopt and should adopt the rule which will produce the best results in the administration of justice. In my judgment the true rule is that when the transaction is complete, and the party seeking relief has performed on his part, the plea of *ultra vires* by the corporation which has acquiesced in it, is inadmissible in an action brought against it for not performing its side of the contract, in all those instances where the party who has performed cannot, upon rescission, be restored to his former *status*.

In the cases maintaining the contrary doctrine the reasoning of the courts has been:

1. That corporators might, by ratifying corporate acts by their acquiescence, indefinitely extend and amplify their granted powers.

2. That consent on the part of those who do an act which they have no power to do cannot make it legal.

3. That to hold that an act performed in executing a void contract makes all its parts valid, is to say that the more that is done under an unauthorized contract, the stronger is the claim to its enforcement by the courts.

To the first objection a sufficient answer is that the state may interpose its authority at any time and compel an abandonment of the act in excess of power, and, if need be, revoke the charter of the company for its usurpation.

When the state challenges the legality of the transaction, the paramount and only question is whether it has bestowed upon the company the requisite authority to engage in it. When the question arises between the company and the other party to the contract, other legal principles apply in determining whether the contract shall be observed. It will be admitted that where there is an absence of authority on the part of a corporation to do an act, the requisite power cannot be imported into the transaction, either by the consent of stockholders or by the execution of the contract by the other party

to the agreement. The contract must necessarily continue to be *ultra vires*. No such effect has been attributed in any of the cases to acquiescence or unilateral performance. The basis upon which the enforcement of the contract in such cases rests is that the company is estopped from setting up its own unauthorized act, and its own incapacity, to evade performance on its part, after receiving the fruits of the bargain. The power of the company is not amplified, the agreement is none the more legal, in the sense that there was authority to execute it; the court simply refuses to entertain the defence, which common honesty forbids the company to make. A man may become bound by the act of an unauthorized agent, and be held liable to the contract made for him, not on the ground that the agent in fact had any authority, but for some conduct on the part of the alleged principal which precludes him from raising the question of authority.

No reason is perceived why the rules of fair dealing, which are so rigorously applied to natural persons, shall not pertain as strictly to private corporations. No instance is known where a natural person can set up in his own behalf, and for his own advantage, his want of authority to do an act for which he has received the consideration from the other party. Transactions which are immoral, illegal, forbidden by statute, or contrary to public policy, are not embraced in this discussion; they cannot furnish the basis for a legal cause of action.

Why is it that *extra vires* contracts are recognized as unassailable, and are permitted to stand as the foundation of rights acquired under them, after they have been executed on both sides?. Such execution imparts no additional power to the corporate body. It does not transmute the negative into the positive. The absence of power is as apparent after as before performance. Why is it that corporations are compelled to pay money borrowed in excess of authority, and to pay the stipulated rent for premises unlawfully leased, for the period of occupation?

The law does not imply a contract to pay the bondholders the money thus received. It is illogical to say that the law

will imply a contract by the company which it has no power to make for itself. A contract cannot be implied where an express contract cannot be made. The law recognizes the obligation; it precludes or estops the attempt to evade it. Apply to it what legal phrase you may, the underlying principle is that the corporation cannot set up its own infirmity when it is unconscionable to do so. The law forbids the defence on account of the flagrant injustice which would otherwise be done. The question of corporate power is not entertained.

To enable recompense to be had to this extent, the contracts are respected, not that they rest in authority, but because good conscience requires it.

How then can recognition of the estoppel be denied where the contract has been executed on the one side, and the party performing cannot, upon rescission, be restored to his former *status?*

Why should the corporate body be permitted to plead its own wrongful act, and set up its own infirmity as a bar to the recovery by the other party of what it should in right and justice be accorded?

It is true that a person cannot, by his own act, acquire a right against another; the other must, in some way, bind himself. The acquiescence in the contract, in virtue of which the other party performs, and the acceptance of its benefits, constitute the binding acts, and raise the estoppel. I am unable to see how, upon a just conception of the legal principles involved, a different rule can be applied where the corporation has acquiesced in the contract, and the other party, by performance on his part, has been led into a position from which he cannot be extricated.

Misconception arises from failing to distinguish between those rights which parties acquire as between themselves, and the rule by which corporate authority must be measured and limited when the state interposes to assert its prerogative.

Nor does the liability of the company rest upon the doctrine of ratification.

In its ordinary legal acceptation ratification applies to such

contracts as a party has authority to make. Repeated affirmations of a contract by one who has no authority to enter into it, cannot supply the requisite authority.

But acquiescence in it, upon which the other party acts, may, and does, upon settled legal principles, preclude the parties from starting the question of power as between themselves. There is, in fact, a subsisting contract, actually executed in due and legal form, which, under the rule stated, is unimpeachable, except at the instance of the state. It is thus, in legal contemplation, impressed with the vigor and incidents of a valid contract as between the parties, and there is no difficulty in enforcing it in a suit at law.

It is like the case of one who makes, in legal form, a conveyance of real estate which he has no power to convey, and not like the case where the true owner fails to do some act which may operate as an equitable estoppel to his setting up his title against the person who has been misled by his conduct. In the former case the grantee could maintain an action at law against the grantor to recover possession of the premises granted. In the latter case the relief must be sought in a court of equity.

But whether the rule which I have formulated shall be applied to this case or not, the judgment below should, in my opinion, be affirmed, upon the ground that the lease in this case must be regarded as substantially a contract as fully executed on both sides as those unauthorized contracts in which money has been loaned to or work done for a corporation, for which it has issued its bonds to the creditor.

The agreement was entered into November 3d, 1871, between the Camden and Atlantic Railroad Company, and the Mays Landing and Egg Harbor City Railroad Company, in and by which it was agreed that if the latter company would construct the branch road in a specified manner, on or before the 1st day of July, 1872, the former company would guarantee the bonds of the latter company to the amount of $37,500, to be used in the construction of the said road, and take a

lease for the same, when completed, for nine hundred and ninety-nine years at a specified rental.

In pursuance of this agreement the bonds were issued by the branch road, and guaranteed by the main line. The road was built under the direction of the main line, and the lease executed.

Every term of this agreement on both sides has been fulfilled, and the agreement, in all respects, substantially executed.

The annual report of the directors of the main line to the stockholders for the year ending December 31st, 1871, recited the terms of this agreement in detail.

Annually thereafter, until 1879, the existence of the lease, and the income and disbursements incident to the operation of the branch were duly reported to the stockholders of the main line, during all which time no attempt was made to avoid the lease.

We must impute to the stockholders of the main line utter neglect of their affairs, if we say that they did not have notice of the agreement to build the branch road, and of the lease executed in pursuance thereof.

The only reasonable inference from the circumstances proven is that they had knowledge of the transaction, and that it was engaged in and consummated with their approval and acquiescence. This case presents all the features which have led the judicial mind, in the cases cited, to establish the distinction between executory and executed contracts, in which respect it essentially differs from the Thomas case, in 101 *U. S.* This was not, as in the case in the federal court, the mere leasing of a road owned by the lessor, where the repudiation of its terms would restore both parties to their former *status*.

Here the lessor built the road, not for itself, but at the instance of and for the lessee, with the proceeds of bonds guaranteed by the lessee to promote and effect the scheme. The branch road was a mere instrument in the hands of the main line to consummate the undertaking.

By the clearly expressed contract of the parties the road

was to be the road of the lessee, the lessor to have only the fixed rentals.

The lessor has fulfilled every term of its agreement, and put the lessee in possession of all that it stipulated for. Nothing remains on the part of the lessor to be done. We must look at the substance of things in applying legal principles. The lease for nine hundred and ninety-nine years is practically an absolute transfer of the road to the lessee, and the rental a mere mode of paying the lessor for the work done and money expended in constructing the road for the lessee, instead of paying a fixed principal sum. The case does not, in effect and substance, differ from what it would have been if the main line had employed the branch road to construct the branch at a stipulated price, and had issued its bonds in payment, after completion and acceptance of the work.

All the cases concede that under such circumstances the contract must be treated as executed.

If the contract had been to compensate the branch road for the work, by the bonds of the main line securing the payment of an annuity for nine hundred and ninety-nine years, and those bonds had been delivered, would it be asserted that it was, in substance, the less an executed agreement? It is the merest verbiage and form, whether it is termed a lease securing a rental for nine hundred and ninety-nine years, or a bond securing an annuity for a like term.

The injustice and inadmissibility of permitting the main line to repudiate its bonds after it has been in occupancy of the road for more than seven years, because the road proved to be unprofitable, would not be more glaring than the inequity of the defence interposed here to the payment of the rental. The work undertaken to be done was fully executed by the branch road, and the manner in which it is to be paid for is immaterial, so far as the principle involved is concerned. There is no consideration of justice and fair dealing, which, in the cases referred to, led to the rejection of the offer by the corporations to set up their own incapacity in avoidance of their just obligations, which is not most forcibly presented by

JUNE TERM, 1886. 573

Camden and Atlantic R. R. Co. v. Mays Landing, &c., R. R. Co.

this case. It cannot, in the application of legal principles, be dissociated from executed contracts without disregarding the reasons which lie at the foundation of the rule. If the lease is subject to the defence of *ultra vires*, the guarantee of the bonds is also incapable of enforcement, and thus loss will likewise fall upon those who advanced money, upon the faith of the guaranty, to be used under the direction of the lessee, and for its purposes.

If such a doctrine is established, who can answer for the solvency of our insurance companies, savings banks and moneyed institutions?

It is a matter of common knowledge that corporate bodies, in many instances, through misconception of their powers, or otherwise, have exceeded the legal limits of their authority.

An action to enforce against the main line its guaranty of these bonds could not be classed with those cases in which companies have been required to return the money they had received on *ultra vires* contracts, or to pay rentals for the period of occupancy.

If the invalidity of the contract and the right to repudiate it be conceded, the law cannot raise an implied obligation on the ruins of the contract upon which to found a recovery. The liability of the defendant upon the bonds must rest, if it exists at all, upon the contract of guaranty.

The money was not paid to the main line, but to the obligor of the bonds, and no obligation can be implied on the part of the defendant to repay it. The validity of the guaranty contract must be affirmed, or no action can lie against the defendant.

In the destruction of the contract there must be an entire absence of legal liability.

The legal doctrine, which must be invoked to maintain an action by the bondholders on the guaranty, will support the judgment in this case.

The doctrine of estoppel by acquiescence, in cases which present the characteristics which appear here, can work no inequity, for it may safely be presumed that the parties to be

affected by an engagement are competent to determine what will best promote their own interest, and for any error in judgment they, and not others, should suffer.

The contrary doctrine, affording so easy an escape from the consequences of their acts, invites them to overstep the boundaries of their authority.

There can be no dissent from the assertion that good faith and honest dealing unite in forbidding that the defence here set up shall be successfully interposed. In my opinion, the law is against it, and the judgment below should be affirmed.

DIXON, J.   I vote to affirm, upon the ground that the Camden and Atlantic Railroad Company cannot set up that its own charter has become void under section 17, so long as it continues to exercise the powers granted by the charter, and that unless the charter is considered as avoided under section 17, the power to build the branch road continued when this lease was made, and consequently, according to *Branch* v. *Jessup*, 106 *U. S.* 468, the power to lease then existed.

What would be the result if some one besides the corporation itself were alleging the invalidity of the charter, need not now be considered.

DEPUE, J. (dissenting.)   I agree with the opinion of Mr. Justice Van Syckel that the Camden and Atlantic Railroad Company had no power, at the time the lease was made, to construct the line of railroad in question under its charter, and that the acceptance of the lease by that company was *ultra vires*.   But I dissent from the result that is reached.

The expression *ultra vires* is used in different senses—to express either that the act of the directors or officers is in excess of their authority as agents of the corporation, or that the act of the majority of the stockholders is in violation of the rights of the minority, or that the act has not been done in conformity with requirements of the charter, or that the act is one that the corporation itself has not the capacity to do, as being in excess of its corporate powers.

JUNE TERM, 1886. 575

Camden and Atlantic R. R. Co. v. Mays Landing, &c., R. R. Co.

The indiscriminate use of this expression, with respect to cases different in their nature and principles, has led to considerable confusion, if not misapprehension. Where the act done by directors or officers is simply beyond the powers of the executive department of the corporation as the agency by which the corporation exercises its functions, and not of the corporation itself, it may be made valid and binding by the action of the board of directors, or by the approval of the stockholders. Where the act done by stockholders is not in excess of the powers of the corporation itself, but is simply an infringement upon the rights of other stockholders, it may be made binding upon the latter by ratification or by consent implied from acquiescence. Where the infirmity of the act does not consist in a want of corporate power to do it, but in the disregard of formalities prescribed, it may or may not be valid as to third persons dealing *bona fide* with the corporation, according to the nature of the formality not observed, or the consequences the legislature has imposed upon non-observance. These are all cases depending upon legal principles, not peculiarly applicable to corporations, and the use of the phrase *ultra vires* tends to confusion and misapprehension. In its legitimate use, the expression *ultra vires* should be applied only to such acts as are beyond the powers of the corporation itself. In this sense it is to be applied in this case.

In the discussion of this subject a distinction is sometimes taken between the acts of a corporation, which it is not expressly, or by necessary implication, empowered to do, and acts expressly forbidden to it, treating the latter as incapable of being endowed with any validity, and the former as susceptible of ratification, and capable of obtaining validity from equitable estoppel. The distinction, if well founded, is obliterated by the third section of the General Corporation act, which provides that in addition to the powers enumerated in the first section of the act, (which are the usual powers of all corporations,) and those expressly given by the charter, no corporation shall possess or exercise any corporate powers, except such as shall be necessary to the exercise of the powers

so enumerated and given. *Rev., p.* 177. This court has held that this section is a prohibition of acts not within the scope of the powers granted, and that contracts in contravention of it are illegal. *Morris and Essex R. R. Co.* v. *Sussex R. R. Co.,* 5 *C. E. Green* 542. The statutory prohibition and disability extend to stockholders as well as to the corporation. Except for the purposes of organization and action, the corporation consists of the body of its stockholders, and they cannot exercise or authorize any corporate powers which are denied to the corporation itself.

The suit is upon the covenant for payment of the rent reserved, for rent accruing after the defendant abandoned possession and gave notice of its renunciation of the lease. The cause of action, therefore, rests wholly upon the validity of the covenant in the lease.

The defendant, at the time the lease was taken, had powers appropriate to the construction and operation of its main line. It had no power to construct or operate a railroad on the route of the leased line. By force of the statute referred to, a leasing by the defendant of that line of railroad was prohibited, and the contract of leasing was illegal. The defendant's charter was a public act, and expressed with precision the exact powers granted to it. The statute prohibiting the exercise, by any corporation, of any powers beyond those granted in its charter and the powers enumerated, was also a public statute. The lease was made by the plaintiff to the defendant, with full knowledge of the corporate powers of the latter, and of its incapacity to take the lease. Fraud or imposition is out of the question. The proposition for consideration is the legal principle by which a contract of leasing, which is under the ban of the statute, and illegal, may be made a legal and enforceable contract.

The lease could not acquire validity from the fact that the plaintiff was induced to construct its railroad by the defendant's agreement to take a lease. The preliminary contract was also invalid. Nor could it obtain validity from the subsequent ratification, even though it was ratified by all the

stockholders. The doctrine of validating a contract by sub-
sequent ratification presupposes capacity to contract, and the
defendant's incapacity attached, as well to the contract, which
should arise from ratification, as to the original contract. In
*Ashbury Railway Carriage and Iron Co.* v. *Riche, L. R.,* 9
*Exch.* 224, 262, Mr. Justice Blackburn, in the Court of Ex-
chequer Chamber, expressed himself thus: "I do not entertain
any doubt that if, on the true construction of a statute creating
a corporation, it appears to be the intention of the legislature,
expressed or implied, that the corporation shall not enter into
a particular contract, every court, whether of law or equity,
is bound to treat a contract entered into contrary to the enact-
ment as illegal, and therefore wholly void, and to hold that
a contract wholly void cannot be ratified." This language is
quoted with approval in the same case in the House of Lords.
Lord Chancellor Cairns declared that it summed up and ex-
hausted the whole case. Lord Selborne said "that where
there could be no mandate there cannot be any ratification,
and that the assent of all the shareholders can make no dif-
ference when a stranger to the corporation is suing the com-
pany itself in its corporate name upon a contract under the
common seal. No agreement of shareholders can make that
a contract of the corporation which the law says cannot and
shall not be so." *L. R.,* 7 *Eng.* & *Ir. App.* 653, 695.

The contention is that the lease, though invalid in its in-
ception, was given validity by acquiescence, and that there-
from an estoppel arose, which concludes the defendant from
setting up its invalidity. *Kent* v. *Quicksilver Mining Co.,*
78 *N. Y.* 159, was mainly relied on. By its charter power
was given to the company to issue certificates of stock repre-
senting the value of its property, in such form and subject to
such regulations as it might by its by-laws prescribe, without
any limitation upon its power to issue stock. By a by-law
the company provided that certificates of stock amounting to
$10,000,000 should represent the value of its property.
Under this by-law certificates of stock were issued. The
holders of these certificates were on an equality in participa-

tion in the profits of the business.   Subsequently, the company
being in need of money, a new by-law was adopted, authoriz-
ing the issue of preferred stock, on which a bonus of $5 per
share should be paid.   The by-law provided that the pre-
ferred stock should be entitled to interest at the rate of seven
per cent. per annum, to be paid annually out of the net earn-
ings of the company, and that the surplus of the earnings,
after payment of seven per cent. interest on the preferred
stock, should be divided *pro rata* among the holders of pre-
ferred and common stock.   It also provided that preferred
stock should be issued only to holders of the common stock,
and that on the issue of preferred stock common stock should
be surrendered, share for share.   Under this last by-law pre-
ferred stock was issued, but for each share of preferred stock
a share of common stock was surrendered—the number of
shares and the nominal value of each share being still the
same.   The controversy was between holders of common
stock, issued under the original by-law, and the holders of
preferred stock, and the proposition presented for decision,
as appears by the opinion of the court on page 183 of the
report, was the power of the corporate body, or of the ma-
jority of the stockholders, to provide for the creation of a
preferred stock, so as to bind a minority of the stockholders
not assenting thereto.

In the case just cited there was no overissue of stock.   Nor
was the power of the company to classify its stock and give one
class of stockholders a preference over the other involved.   The
learned judge who delivered the opinion (page 178) declared
that there was "nothing in the constitution or the law that
inhibits a corporation from beginning its corporate action by
classifying the shares in its capital stock with peculiar privi-
leges to one share over another, and thus offering its stock to
the public for subscription thereto."   And (on page 187) he
distinguished the case before the court from Ashbury Railway
Co. *v.* Riche in the fact that in the latter case the act was ex-
pressly prohibited.   The ground of decision was that the
original by-law, which admitted the holders of stock to an

·equality in rights, " entered into the compact between the corporation and the taker of every share;" that the certificate of stock was " a muniment of the stockholder's title, and evi-·dence of his right," and expressed " the contract between the corporation and his co-stockholders and himself—a right as inviolable as is any other right in property which could not be taken away or lessened against the will of the owner ;" and that the repeal of the by-law under which the stock was originally subscribed impaired the right acquired by the subscription. The act of the corporation in issuing preferred stock was not condemned as being in excess of its powers under its charter, and the doctrine of *ultra vires* in its proper sense was not presented by the case. Indeed, in its opinion the court carefully distinguishes between acts of a corporation which are *malum prohibitum*—and every act in contravention of a statutory prohibition is *malum prohibitum*—and acts which, though unlawful, are merely injurious to the rights of others. The former the court declared that no assent of stockholders could validate ; to the latter the doctrine of equitable estoppel by ·acquiescence was applied, for the reason that such acts are unlawful only when done without the consent of the persons injuriously affected thereby. The doctrine of *ultra vires* did not arise except as it arises in the most comprehensive and in-·definite sense in every case where the right of a party to break his contract arises. The decision is distinguished from the ·case in hand in the fact that the act of the company was not one that was in excess of its corporate powers, whereas in this ·case the lease was undeniably beyond the corporate powers of the defendant, and is also distinguishable, as the court distinguished the Ashbury Railway case, in the fact that the act of the defendant in taking the control of the plaintiff's road and exercising its franchises was expressly prohibited by the statute.

I have already referred to *Ashbury Railway. Co.* v. *Riche,* ·decided in the House of Lords and reported in *L. R.,* 7 *Eng.* ·& *Ir. App.* 653. In that case the company was created a corporation by articles of association under the Companies act, (25

*and* 26 *Vic.*, *c.* 89,) which defined the objects for which the company was established to be "to make and sell or lend on hire railway carriages and wagons and all kinds of railway plant, fittings, machinery and rolling stock, to carry on the business of mechanical engineers and general contractors, to purchase and sell, as merchants, timber, coal, metals and other materials, and to buy and sell any such materials on commission or as agents." The company purchased a concession for making a line of railway in Belgium, and gave a contract for its construction to Riche. Riche began, and for some time continued the work for the construction of the line, and for some time the company paid to Riche the money earned by the contract. In an unfinished condition of the work the company repudiated its contract with Riche, and the latter brought an action for damages. The House of Lords held that the action could not be maintained; that the contract, being in its inception void, as being beyond the provisions of the statute, could not be ratified, even by the whole body.

In the Ashbury Railway Company case the corporation was organized under a general act, which allowed the shareholders, by the memorandum of association, to determine the purposes for which the company should be organized, and there was plausibility in the argument that shareholders, having an option in determining the scope of the company's power, a contract with an innocent third person, having the sanction of all the shareholders, should be binding, but the contract was nevertheless held to be void upon principles of public policy, for the reason, as was said by Lord Hatherly, that the legislature, in requiring the objects of the association to be expressed in the memorandum filed, "had in view distinctly the protection of outside dealers and contractors from the funds of the company being applied, or from a contract being entered into by the company, for any other object than those specified in the memorandum, which the legislature thought should remain forever unchanged." Much more clearly does the principle apply to a corporation created by a special charter granted by the legislature, which has prescribed the

corporate powers to be exercised without any volition on the part of the corporators. The latest cases on this subject in the House of Lords hold the principle to apply to corporations with special charters granted by act of parliament. *Attorney-General* v. *Great Eastern Railway Co.*, 5 *App. Cas.* 473; *Wenlock* v. *River Dee Co.*, 10 *Id.* 354. Still more clearly does the principle apply where the legislature has not left its policy to be ascertained by inference, but by a general statute applicable to all corporations has expressly enacted that no corporation shall exercise any corporate powers, except such as shall be necessary to the exercise of the powers enumerated and given.

Nor can this case be distinguished in the fact that in the Ashbury Railway Company case the action was for damages. If the contract be a valid contract, the remedy for the breach of it is determined by the circumstances of the particular case. Whether it be for unliquidated damages as compensation, or for debt upon a liquidated sum, cannot alter the validity of the agreement as a contract. The law furnishes the remedy upon contracts, and a contract cannot be made valid or invalid according as one form of remedy or another is resorted to. On that theory all of the covenants in the lease would be invalid, except those for the payment of rent, for all the other covenants are such as that a breach would sound in damages.

Two cases in the United States Supreme Court are also in point. *Thomas* v. *Railroad Co.*, 101 *U. S.* 71, and *Pennsylvania R. R. Co. et al.* v. *St. Louis, Alton and Terre Haute R. R. Co.*, 118 *Id.* 290, 630; *S. C.*, 24 *Am. & Eng. R. R. Cas.* 58. In the first of these cases a railroad company of this state had leased its road, franchises and property for a term of twenty years. The lease contained a covenant that the railroad company might, at any time, terminate the letting, and resume possession of its property, but that in that event it should pay the lessee the value of the lease for the unexpired term. The company exercised its option, and took possession of its road before the expiration of the term, and the lessee brought an action to recover on this covenant. In the second case the

St. Louis, Alton and Terre Haute Railroad Company had leased a portion of its railroad to the Indianapolis and St. Louis Railway Company for a term of ninety-nine years, and the Pennsylvania Railroad Company and four other railroad companies had entered into a contract with the lessor to guarantee the payment of the rent, and the performance by the lessee of the covenants in the lease. The suit was by bill in equity by the lessor against the lessee and the guarantors for the payment of the rent, and the specific performance of the covenants.

In the first case the lessee was a natural person, with no disability to contract, but he was held to have no remedy on his contract because it was not binding on the other party for want of a similar power to contract. In the second case, the lessor had capacity, by legislative authority, to make the lease, and the incapacity was in the lessee to take the lease and in the guarantors to make the guaranty. In both cases the incapacity was in the party setting up its want of power to make the contract. The defence was sustained in each case on the ground that the contract, being beyond the power of the corporation to make and forbidden by public policy, was void.

In the Thomas case, acquiescence and delay in rescinding the contract was relied on to support the action. In response to the contention that the company, having entered into the agreement, it was its duty to rescind or abandon it at the earliest moment, Mr. Justice Miller said : " Though they delayed its performance for several years, it was nevertheless a rightful act when it was done. Can this performance of a legal duty both to stockholders and to the public give to the plaintiffs a right of action ? Can they found such a right on an agreement void for want of corporate authority and forbidden by the policy of the law ? To hold that they can is to hold that any act performed in executing a void contract makes all its parts valid, and that the more that is done under a contract forbidden by law the stronger is the claim to its enforcement by the courts."

In Pennsylvania R. R. Co. v. St. Louis, Alton and Terre Haute R. R. Co., equitable estoppel was a prominent feature. The defendants were railroad companies whose traffic was east of Indianapolis, and being desirous of having a connection for the purpose of reaching St. Louis with their business, agreed with the complainants that the Indianapolis and Terre. Haute Railroad Company should lease, for a term of ninety-nine years, a part of the complainant's road between St. Louis and Indianapolis, and thus make a continuous line between St. Louis and Terre Haute; and that the defendants should guarantee the payment of the rent and the performance of the other obligations of the latter company; and that if the St. Louis and Terre Haute Company should refuse to execute this operating contract, the defendants might procure some other company to build the seventy miles of road from Indianapolis to Terre Haute, and that in like manner they would guarantee the performance of its obligations in the lease. The Terre Haute and Indianapolis Company having refused to execute the lease, another corporation, called the Indianapolis and St. Louis Company, was organized, under the influence and control of the guaranteeing companies, to build the road necessary to complete the desired connection. This company executed a lease with the complainant, and at the same time all the guaranteeing companies except the Pennsylvania Company executed a new guaranty as a substitute for the former—the liability of the Pennsylvania Company being rested upon the original contract of guaranty and the averment that the new company which executed the lease was in reality the creature of that company. The lessee took possession of the road in 1867 and operated it for ten years. The bill charged that the lessee was in default in the payment of rent; that it was insolvent and had allowed the road and equipment to run down and be depreciated, and that the traffic over it had been largely diminished by the construction of a road by the lessee and the other defendants, nearly parallel to the complainant's road and not far from it, and that for these reasons the complainant's contract with the defendants was more valuable than would

be the resumption of the possession of the road in its deprecia-ated condition. The prayer for relief was that the lessee should specifically perform its obligations in all the respects mentioned, and that in default thereof the guaranteeing defendants be required to do so.

In the case cited the lessor had capacity to make the lease, but the lessee had no capacity to take the lease. The defence was that the lease and the contract of guaranty were *ultra vires* and void. In the facts, as well as in the relief prayed, this case is like the case now before the court; for the result of the affirmance of the judgment below will be to establish the liability of the defendant upon the lease for the full unexpired term—a judicial determination, in effect, that the defendants shall specifically perform the covenants in this lease continuously for the period for which it was made. The lease and the contract of guaranty were held to be void, and the bill was dismissed. The case presented impregnable grounds for upholding the contract, if a contract *ultra vires* and illegal could, under any circumstances, be validated by equitable estoppel. It was contended that though the contract of lease might be void so that no action could originally have been sustained upon it, there had been for ten years such performance of it, in the use, possession and control of plaintiff's road and its franchises, by the defendants, that they could not now be permitted to repudiate or abandon it—that it now presented one of a class of cases which hold that where a void contract has been so far executed that property has passed under it, and rights have been acquired under it, the courts will not disturb the possession of such property, or compel restitution of money received under such a contract. The court disposed of this contention in these words : " Undoubtedly there are such decisions of courts of high authority, and there is such a principle, very sound in its application to appropriate cases. But we understand the rule in such cases to stand upon the broad ground that the contract itself is void, and that neither what has been done under it, nor the action of the court, can infuse any vitality into it. Looking

at the case as one where the parties have so far acted under such a contract that they cannot be restored to their original condition, the court inquires if relief can be given independently of the contract, or whether it will refuse to interfere as the matter stands. We know of no well considered case where a corporation which is party to a continuing contract, which it had no power to make, seeks to retract and refuses to proceed further, it can be compelled to do so." My examination of the cases confirms this statement. In *Whitney Arms Co.* v. *Barlow*, 63 *N. Y.* 62, the goods had been manufactured and delivered, and the suit was on notes given in payment. The court held that the defence of *ultra vires* was not maintainable, for the reason that the contract had been fully performed by the other party, and the corporation had the full benefit of the performance. In *Woodruff* v. *Erie R. R. Co.*, 93 *N. Y.* 609, the suit was for rent. The lessee had used and occupied the railroad. The court held that the lessee was estopped from disputing the validity of the lease so far as it had been executed. In *Parish* v. *Wheeler*, 22 *N. Y.* 494; *Rome Savings Bank* v. *Kramer*, 32 *Hun* 270, and *Bradley* v. *Ballard*, 55 *Ill.* 417, the consideration had also been fully executed. It is with respect to this class of cases that the courts have said that the plea of *ultra vires* should not prevail where it would work a wrong. In *Davis* v. *Old Colony R. R. Co.*, 131 *Mass.* 258, Chief Justice Gray discussed the whole subject in an opinion of consummate ability. He said that "a corporation may indeed be bound to refund to a person from whom it has received money or property for a purpose unauthorized by its charter, the value of which it has actually received ; for in such a case to maintain the action against the corporation is not to affirm, but to disaffirm the illegal contract." In that case the suit was against a railroad corporation and a company incorporated for the manufacture of musical instruments, upon an agreement to guarantee the expenses of a musical festival, and it was held that no action could be maintained against either corporation, although the guaranty was made with the reasonable belief that the pro-

posed festival would be of great pecuniary benefit to the guar-
antors by increasing their business, and the expenses had been
incurred in reliance upon the guaranty. Other illustrations
of the application and limitation of this principle may be
found. For instance, contracts invalid under the statute of
frauds for want of writings are not validated by part perform-
ance, and the party is restricted to remedy upon them to the
extent to which they have been executed, either upon a *quan-
tum meruit* or for use and occupation. *Smith* v. *Smith*, 4
*Dutcher* 208; *McElroy* v. *Ludlum*, 5 *Stew. Eq.* 828. In
the St. Louis and Alton case Justices Bradley and Harlan
dissented, but the ground of their dissent does not impugn the
doctrine held by the court—that the contract of a corporation,
*ultra vires* to the extent that it was unexecuted, was void.
It may also be remarked that *Bissell* v. *M. S. & N. I. R.
R. Cos.*, 22 *N. Y.* 258, is inapplicable. The action was for a
tort, and it is settled that a corporation cannot defend in an
action for a tort done by it on the ground that the business in
the prosecution of which the tort was done was *ultra vires.*
*New York, Lake Erie and Western R. R. Co.* v. *Haring*, 18
*Vroom* 137; *Buffett* v. *T. & B. R. R. Co.*, 40 *N. Y.* 168;
*National Bank* v. *Graham*, 100 *U. S.* 699; *Salt Lake City* v.
*Hollister*, 118 *Id.* 256.

.The cases I have cited are decisions upon principles of the
common law too often recognized and acted upon by the courts
of this state to be now disregarded. They are in harmony
with the decisions of most of our sister states. To some ex-
tent in this country the doctrine of *ultra vires*, as enforced in
the English courts, has been modified; but the fundamental
doctrine that the unexecuted contracts of a corporation which
are outside of the powers granted are void, has, in the courts
of this country, been generally, if not universally adopted, and
I think I hazard little in asserting that in no well considered
case has it been departed from, except to the extent of allow-
ing a recovery to the extent of the consideration actually re-
ceived. I do not stop to discuss the question whether a lease
is an unexecuted contract in respect of the unexpired part of

the term, for it seems to me to be perfectly obvious that such a contract is a continuing contract, as well with respect to the payment of rent as to the occupation of the premises. It is on this theory that eviction is a defence to the recovery of rent, and a rightful surrender before the expiration of the term absolves a party from further payment of rent. If any authority be required for so obvious a principle, it is furnished by the cases cited from the federal court.

But, independent of the illegality of this contract under the statutory prohibition, which of itself would interdict its enforcement, there is present in this case none of the elements of an equitable estoppel. The plaintiff is chargeable with knowledge of the incapacity of the defendant to enter into the lease, and of the statutory prohibition of such a contract. With such knowledge it accepted the risk that the defendant might, in the future, repudiate the lease and abandon the premises. The doctrine of equitable estoppel is designed for the protection only of innocent parties who have been misled. By the repudiation of the lease, and the surrender of its railroad to the plaintiff, it has restored to it all that it gave as the consideration of the contract. The plaintiff has been paid the stipulated rent for the period during which the defendant had the benefit of the use of the railroad, and it is not even pretended that the road, when surrendered, was of less value than it was when originally built. The entire loss to the plaintiff is the profit it expected to have made by an advantageous contract in the continuance of a lease, which is worth more to it than the possession of its railroad. In a court of law the doctrine of estoppel *in pais* is never applied, except to the extent of preventing a party who has been misled from being defeated in a recovery of indemnification. Our courts reject the notion that it can be used to enable such a party to recover the profits, which would be the fruits of the transaction if it had been carried into effect. *Campbell* v. *Nichols*, 4 *Vroom* 81 ; *Phillipsburgh Bank* v. *Fulmer*, 2 *Id.* 52. For these reasons I think the judgment should be reversed. Mr. Justice Knapp desires me to say that he concurs in this opinion.

*For affirmance*—THE CHANCELLOR, DIXON, MAGIE, REED, SCUDDER, VAN SYCKEL, BROWN, CLEMENT, COLE, MCGREGOR, WHITAKER.   11.

*For reversal*—DEPUE, KNAPP, PATERSON.   3.