VANDERVEER v. ASBURY PARK & B. ST. RY. CO. et al.

(Circuit Court, D. New Jersey. July 16, 1897.)

1. STREET RAILROADS — NEW JERSEY STATUTES — ILLEGAL BONDS — INNOCENT HOLDER — CLAIM FILED WITH RECEIVER.

Under the New Jersey statute providing for the incorporation and regulation of street-railway companies, approved April 6, 1886, which provides, among other things, that no company incorporated under the act can begin to build its road until the whole amount of its capital stock has been subscribed for by responsible parties, and 50 per cent. of each share has been paid in cash, that bonds secured by mortgage can only be issued to the amount of the capital stock, and for the purpose of aiding in the construction of the road, such bonds issued before the whole amount of the capital stock of the company has been paid in cash, and expended in the construction of the road, are illegal, and are void, except so far as they are held by bona fide purchasers for value without notice, but, where so held, constitute a valid claim against the property, in the hands of a receiver, for the amount actually received therefor by the company.

2. SAME — ILLEGAL CONSTRUCTION CONTRACT.

A contract by which certain directors of a street-railway company, acting in the name of a third person, who is a mere dummy, are to construct the road, and divide between them the balance of the stock and bonds not required therefor, is fraudulent, and bonds issued pursuant thereto are void.

3. SAME — ULTRA VIRES CONTRACTS.

A contract by which a street-railway company, in order to procure a right of way over streets running through lands owned by a land company, guarantied that certain lots of the land company would become worth a certain price, and agreed to pay the difference between such price and what the lots would bring at auction, is not ultra vires.

4. INSOLVENT CORPORATION — RIGHT TO AN ACCOUNTING — GENERAL CREDITOR.

General creditors of an insolvent corporation, who have proved their claims, have an equitable lien on the assets in the hands of a receiver, and, on the refusal of the receiver to enforce the lien, they have the same right as the receiver to require an accounting of the amount due on the mortgage bonds.

Arthur D. Vinton and William B. Guild, for complainant.

Charles L. Corbin and Acton C. Hartshorne, for Avon by the Sea Land & Imp. Co.

G. D. W. Vroom, for receiver.

Samuel A. Patterson, for Asbury Park & Belmar St. Ry. Co.

KIRKPATRICK, District Judge. The Asbury Park & Belmar Street-Railway Company was organized under an act of the legislature of the state of New Jersey entitled "An act to provide for the incorporation of street-railway companies, and to regulate the same," approved April 6, 1886, which provided, among other things, that "seven or more persons may associate themselves together by articles in writing for the purpose of forming a corporation to construct, maintain and operate a street railway for the transportation of passengers," with a capital stock of not less than $10,000 per mile, and that, when at least $2,000 of stock of each mile of railroad, and a proportionate sum for every fraction of a mile thereof, proposed to be constructed, shall have been subscribed and paid for in good faith and in cash to the directors named in said articles of association, and by them deposited with the treasurer of New Jersey, the articles of association might be filed with the secretary of state, and

thereupon become a body corporate, possessed of the usual corporate powers. The length of the road was approximately two miles. The amount named as its capital stock was $75,000. Four thousand dollars was deposited with the treasurer of the state, and the certificate filed with the secretary of state January 6, 1893, together with an affidavit that all the requirements of the law had been complied with. The ninth section of the legislative act provides that:

"No street-railway company incorporated under this act shall begin to build its road until it has filed in the office of the secretary of state a certificate signed and sworn to by its president and treasurer and secretary and a majority of directors, stating that the full amount of its capital stock has been unconditionally subscribed for by responsible parties and that fifty per cent. of the par value of each share thereof has been actually paid in cash."

Such certificate, dated June 1, 1893, was filed in the office of the secretary of state July 7, 1893. The facts that seemed to warrant the officers and directors in making oath to the requisites of the act are set forth in the testimony of George A. Aldrich, on pages 260 and 261 of the record, as follows:

"Q. What evidence was there before now that 50 per cent. of that [the stock] had been paid in cash? A. The evidence of a tender, when stock was demanded, for the payment of it,—the tender for the payment of the stock. Q. What do you mean by that? A. I mean that money was offered for the payment of the stock. Q. You mean that the money was there at the time the board signed the certificate? A. Not particularly at that time; it had been offered. Q. By whom? A. By Mr. Potts and myself. Q. Had it been paid to the treasurer? A. It had been offered to the treasurer, who held the matter until the delivery of the certificate of stock could be furnished him. Q. Was there not laid before the board at that time a check, either certified or otherwise, for about half the amount of the capital stock? A. Yes, sir; there was a check. Q. Whose check was that? A. I think it was my own check. Q. On what bank? A. It was on the Camden bank; but whether it was on the State Bank or the National State Bank of Camden I don't remember. Q. To whose order was it? A. To the order of the treasurer. Q. H. E. Aldrich? A. Yes, sir. Q. For how much money? A. I think it was for $30,000. Q. Was it not for as much as $37,500? A. No; there had been good and sufficient money put up besides that. There was some $5,500 at Trenton, and there were other moneys put up, which reached the $37,500. Q. What became of that check? A. The check was returned for want of delivery of certificates of ownership. Q. Was it never presented to the bank for payment? A. Never presented. The money was never collected. Q. And the company never received anything on that check, then? A. They never entered it on their account. Q. Did they receive anything on that check? A. No, sir. Q. And the check was returned to you? A. Yes, sir. * * * Q. It was handed back to you by the treasurer of the company, when? A. Some time in July, I think it was, of 1893. Q. Has the treasurer of the company ever received any cash for any of its stock? A. No; I think not."

This account of the way the law was complied with is uncontradicted, and must be assumed to be true. By the certificate of incorporation and the accompanying affidavits it was made to appear that the whole $75,000 of stock had been subscribed for in good faith by responsible parties, and yet not one dollar in cash reached the treasurer of the company; and now, on June 1, 1893, an affidavit is filed that 50 per cent. of the stock has been actually paid in cash on each share, and still again not a dollar is paid. That the tender of the check was a mere fraudulent pretense, intended as a salve for the consciences of the affiants, and that it was never intended that

any stock should be delivered for the same, is apparent; and that the directors knew this to be the case is evidenced by the fact that they ratified a contract dated June 1, 1893, with one T. B. Wilson, to build the road, and give him in payment therefor $75,000 in bonds and 699 shares of stock out of a total authorized issue of 750 shares. We are not at this time concerned with the validity of the several issues of stock, further than to determine whether the whole amount was paid for in cash. Not only does that part of the record which has been quoted negative the assertion, but in no part of it is there found any claim to the contrary. The seventeenth section of the act provides:

"That any company incorporated under this act shall have power to borrow such sum or sums of money from time to time not to exceed in the whole its capital stock as shall be necessary to build; construct or repair its road and branches and furnish all necessary property and equipment for the use and objects of said company, and to secure the payment thereof by the execution, negotiation and sale of any bond or bonds secured by mortgages on its property, appurtenances, privileges and franchises, * * * and the proceeds of such bond or bonds shall be used only for the purpose of aiding in the construction, repair, or equipment of the road, its branches and appurtenances."

It appears from this section that bonds secured by mortgage can only be issued to raise money for the purpose of aiding in the construction of a road, and then not to exceed, in the whole, its capital stock. That by the limitation of the bond issue to the whole of the capital stock, the legislative intent was to require the expenditure of the whole of the capital stock in the road-building, is apparent from a reading of the several provisions of the act: The capital stock must not be less than $10,000 per mile of road projected; certificate of incorporation will not be issued until $2,000 per mile has been deposited with the treasurer of the state; work on the road cannot be begun until 50 per cent. of the capital has been paid in on each share in cash. Why these precautions, if the authority to issue bonds is to be limited only by the amount which the incorporators see fit to name in the certificate of incorporation as the capital stock of the road? I am clearly of the opinion that, until the whole amount of its capital stock has been actually paid in cash, and expended in building the road, the company has no authority under the act to borrow any money, by sale or negotiation of bonds secured by a mortgage on its property and franchises, the proceeds of which are to be used only in aid of the construction or repair of the road. It appears from the evidence that the entire cost of the road has not equaled the amount of its capital stock, and, therefore, no aid by issue of bonds was necessary for its completion.

The issuance of the $75,000 of bonds by the directors was unauthorized by law and illegal, and the bonds are void, except so far as they are in the hands of bona fide holders for value without notice. If this were not so, the fraudulent nature of the contract for building the road would, of itself, be sufficient to invalidate the bonds issued under it. The evidence shows that the original contract was made with one Wilson, who was the representative of Potts and Aldrich, directors of the company, a mere dummy set up to represent a contractor, while in fact the work was to be done by the directors, and

the balance of stock and bonds not required for the building of the, road was to be divided between them.   Mr. Aldrich, it would seem from the evidence of Watson, was unable to carry out his part of the agreement, and furnish the money to buy rails and ties and other necessaries for the building of the road, so Mr. Bullock, in February, 1894, was substituted.   Bullock took an assignment of the Wilson contract, in which he agreed to do the work, and pay to Wilson one-half of his profits.   While this agreement was made nominally with Wilson, it is apparent from the evidence that the real parties to the contract were Bullock and Potts, the president of the company. Watson testifies that, in a conversation had with Bullock in regard to the matters relating to the road, Bullock stated to him that his (Bullock's) agreement with Potts was that, after building and equipping the road, the balance of the bonds were to be divided between him and Potts.   Bullock, while admitting the conversation with Watson, denied that he said Potts was to receive one-half of the profits; but it appears from the testimony of Potts that he actually received from Bullock $15,000 in bonds, and it is not pretended by any one that one dollar of bonds was ever paid to Wilson as his part of the profits of the contract.   Bullock knew, as the evidence clearly shows, that the use of Wilson's name in the contract for building the road was a mere form, and that Potts and Watson, directors, were the real parties in interest.   This, of itself, would vitiate the contract, and made invalid the bonds representing the profits made thereunder.   Guild v. Parker, 43 N. J. Law, 430;   Gardner v. Butler, 30 N. J. Eq. 702;  Thomas v. Railway Co., 2 Fed. 877.   None of the bonds have been produced for inspection, and it does not appear that in other respects they are valid obligations of the company.   I have no doubt it is clearly within the power of the board of directors of a street-railway company to make a contract for purchase of their right of way, or the purchase of any rights which may be necessary for the use and enjoyment of their franchise, and to secure the payment of the purchase price by a mortgage upon their plant.   It was within the discretion of the board of directors to pay a lump sum in cash, to pay a percentage of the gross or net receipts, to abide the award of arbitrators, or resort to any other legal method of ascertaining the value of the privilege of laying their tracks over and upon certain specified streets and roads.   The situation in this case was that the Avon by the Sea Land & Improvement Company were the owners of a majority of the lineal feet fronting on the proposed route of the railroad company.   The courts of New Jersey had decided that the railroad could not be legally built or operated without the consent of the Avon Company, and an injunction had been granted, restraining the railroad company, not only from operating, but maintaining their railroad in front of the Avon Company's lands.   It was a matter of necessity with the railroad company to come to some agreement with the Avon Company.   Their existence depended upon it.   The railroad company offered to construct branches to its road, which it said would be of advantage to the Avon Company.   Whether they would or not was a matter in dispute between the parties. The guaranty that certain lots would bring a certain price, or an

agreement to pay the difference between an agreed price and what the lots would fetch at public auction, was a legal way to ascertain the value of the privilege bought by the railroad company.

After the injunction restraining the maintenance and operation of the railroad in front of the land company's premises has, with the consent of the Avon Company, been dissolved, and the suits discontinued, and the railroad company has been granted and entered upon the enjoyment of the privileges which had been the subject-matter of dispute; after the Avon Company has parted with the title to its land in the way provided by the terms of the agreement,—the railroad company is estopped from challenging the propriety of the action of its board of directors in making the contract. The plea of ultra vires in this case, if good, is inadmissible, because the Avon Company, who has performed its part of the agreement, cannot, upon recession, be restored to its former status. Camden & A. R. Co. v. Mays' Landing, etc., R. Co., 48 N. J. Law, 530, 7 Atl. 523; Railroad Co. v. Dow, 19 Fed. 388; Fritts v. Palmer, 132 U. S. 282, 10 Sup. Ct. 93.

The amount ascertained to be due the Avon Company by the railroad company is the sum of $70,000, which is secured by mortgage. The Avon Company has also proved its claim before the receiver appointed by this court for this same amount. Another claim (that of George A. Aldrich) has also been proved before the receiver. The filing of these claims with the receiver renders it unnecessary to pass upon the question whether the Avon Company is estopped by the recitals in its mortgage from denying the validity of the bonds which are secured by the complainant's mortgage; and the amount due thereon, under the corporation act of the state of New Jersey, the adjudication of insolvency, and the appointment of a receiver fastens the debts of the corporation upon its property, which is from that time appropriated exclusively and irrevocably to the payment of its debts. Button Co. v. Spielmann, 50 N. J. Eq. 120, 24 Atl. 571; Haston v. Castner, 31 N. J. Eq. 697. Aldrich and the Avon Company, having filed their claims as general creditors with the receiver of the railroad company, acquired an equitable lien upon its assets; and, upon the receiver's refusal to act in the enforcement of that lien, have the same rights as he to require an accounting of the amount legally due upon the bonds issued by the company, and secured by the mortgage, in order that the assets may be equally distributed among the creditors. The court's finding that the bonds have been illegally issued will not deprive bona fide holders for value without notice of relief. The rule is that the corporation must return the amount which it has actually received. The exact amount so received, and by whom it was paid, whether for the stock or bonds of the company, the evidence submitted does not warrant the court in finding at this time. The validity of particular bonds must be decided "when proof is made, or attempted to be made, of bonds in the hands of holders presenting them." Phinizy v. Railroad Co., 62 Fed. 685.

There should be a reference to a master, to ascertain the cost of the road, and the amount which has been paid for bonds by parties acting bona fide, and without notice of the fraudulent character of the

contract under which the bonds were issued, together with the names of such holders, and the amount held by each. Upon the coming in of this report, a decree will be made, determining the amount each party is entitled to out of the proceeds of sale, together with their respective priorities.